In re MORGAN.

(District Court, W. D. Arkansas, Texarkana Division. May 21, 1900.)

1. BANKRUPTCY—SPECIFICATIONS IN OPPOSITION TO DISCHARGE—AMENDMENT.

Although general order No. 32 (32 C. C. A. xxxi., 89 Fed. xiii.) in bankruptcy provides that specifications in opposition to a bankrupt's application for discharge must be filed within 10 days after the day on which the creditors are required to show cause, it is in the power of the court of bankruptcy, in the exercise of a sound judicial discretion, to permit the filing of amended specifications after the expiration of that time.

2. SAME—DISCHARGE—"CONTEMPLATION OF BANKRUPTCY."

Where a debtor arranges to sell out his entire stock of merchandise, with the intent and for the purpose of paying certain of his creditors, out of the proceeds, in preference to the others, he contemplates bankruptcy, within the meaning of Bankr. Act 1898, § 14b, providing that a bankrupt shall forfeit his right to a discharge if he has, "in contemplation of bankruptcy," failed to keep proper books of account.

3. SAME—KEEPING BOOKS.

A bankrupt sold his stock of goods in bulk, for about half its cost, and under circumstances indicating haste and secrecy, and received part of the price in the form of two checks, which were at once turned over to two of his creditors; the sale having been made to enable him to satisfy those creditors. No entry of the transaction appeared on his books, which were further so defective and irregularly kept that it was impossible to determine from them his true financial condition. A large deficit between his assets and liabilities remained wholly unaccounted for. *Held*, that his application for discharge should be denied, on the ground that his failure to keep proper books of account was "with fraudulent intent to conceal his true financial condition and in contemplation of bankruptcy," within the meaning of Bankr. Act 1898, § 14b.

4. SAME—CONCEALMENT OF PROPERTY.

Where a comparison of the bankrupt's assets and liabilities at the time he engaged in business, some eight months before he became bankrupt, with the assets and liabilities scheduled in the bankruptcy proceedings, shows the disappearance of a large amount of property, which is not accounted for on his books, and of which he fails entirely to give any satisfactory explanation, it must be held that he has concealed from his trustee property belonging to his estate in bankruptcy, and his application for discharge must be refused on that ground.

In Bankruptcy. On bankrupt's application for discharge, and opposition thereto by creditors.

Paul Jones, for objecting creditors.

W. W. Webber and Mr. King, for the bankrupt.

ROGERS, District Judge. On April 4, 1899, A. C. Morgan, the bankrupt, filed an application for discharge, and notice was given creditors, returnable April 15, 1899. On that day the remonstrants filed specifications opposing the discharge. The court ordered a hearing of the application for discharge on May 10, 1899. For some reason, the case was not then heard. A demurrer, however, was interposed to the specifications, and taken in short upon the record, and on the ——— day of November, 1899, was conceded by the remonstrants, and they were allowed, without objections, to file amended specifications. On the 14th of November, 1899, amended specifications were filed, to which the bankrupt on November 22d interposed a demurrer and a motion to strike out. The former was over-

ruled. The motion to strike is still pending and insisted upon. The question argued is whether the court has the power, after the time fixed by general order No. 32 (32 C. C. A. xxxi., 89 Fed. xiii.), in which specifications may be filed, has expired, to allow an amendment of the specifications. The question has not been decided under the present bankrupt law, so far as I know; and I am of the opinion that the allowance of an amendment is a matter of sound discretion, but should not be exercised loosely, but only to meet the ends of justice. Loveland, Bankr. pp. 603, 611, and the cases cited in the footnotes thereto. The motion in this case is overruled.

The bankrupt has filed an answer to the specifications, and the proofs have been taken. Only two grounds contained in the specifications for refusing the discharge need be noticed. It is charged that the bankrupt, while engaged in the banking and mercantile business at New Lewisville, Ark., contemplated the following acts of bankruptcy; that is to say:

"(1) To convey his stock of merchandise at said town of New Lewisville, Arkansas, with the intent to hinder, delay, and defraud his creditors, and to conceal his cash on hands, notes, accounts, choses in action, and securities, with such intent. (2) While insolvent, to transfer, to Hicks Company, Limited, who was then one of his creditors, a part of his property, with the intent to prefer said Hicks Company, Limited, over his other creditors, and also to pay to the treasurer of Lafayette county, Arkansas, the sum of money, to wit, $3,000, which the said treasurer had deposited in said Citizens' Bank as a general deposit, and thereby preferring, while insolvent, the said treasurer over his other creditors; and that while contemplating said acts of bankruptcy, with the fraudulent intent to conceal his true financial condition, he failed to keep books of account or records, both in his business as merchant and as banker, from which his true condition might be ascertained, in this: that the pretended books and records produced by the said bankrupt in this proceeding, and kept by him, failed to disclose either a true statement of his assets or of his liabilities, or from which the amount of assets on hand and the amount of liabilities due by the said Morgan could be ascertained."

The second ground taken in the specifications for refusing his discharge is this:

"That the said bankrupt has committed an offense punishable by imprisonment, as is by the bankrupt law now in force provided, in this: that said Morgan did willfully and fraudulently omit from his inventory and schedule filed herein cash which he then held, or was held for him by others and subject to his control, in the sum of, to wit, $10,000."

It cannot be doubted, in view of the testimony taken, that, when the bankrupt sold out his stock of merchandise, he did so with the intent to prefer the Hicks Company, Limited, and also with the intent to prefer the treasurer of Lafayette county, Ark. He not only testifies that that was his object in selling out the stock of merchandise, but he testifies that after he sold out that he devoted almost the entire proceeds of the sale to the payment of the claim of the Hicks Company, Limited, and to the treasurer of Lafayette county, Ark., as he intended to do. That the sale of his stock of goods, wares, and merchandise with that intent was an act of bankruptcy, there cannot be any question, because the necessary effect of it was to hinder, delay, and defraud his other creditors. In Loveland, Bankr. p. 608, par. 3, the author says:

"What is meant by the words 'in contemplation of bankruptcy' has been the subject of a good deal of discussion and difference of judicial opinion in this country and in England. In some cases it has been held to mean 'in contemplation of insolvency,' or a simple inability to pay as debts should become payable. In other cases it has been held that the debtor must contemplate an act of bankruptcy, or a voluntary application for the benefit of the bankrupt law. The most authoritative definition of these words in this country is contained in the opinion in Buckingham v. McClain, 13 How. 168, 14 L. Ed. 190. In that case the supreme court decided that the words 'in contemplation of bankruptcy' did not mean 'in contemplation of insolvency,' or a simple inability to pay as debts should become due and payable, but meant that the debtor must contemplate the commission of what was declared by the act to be an act of bankruptcy, or must have contemplated an application by himself to be declared a bankrupt."

It must, therefore, in the light of this decision, be held that when Morgan sold his stock with a view of appropriating the proceeds to the payment of the Hicks Company, Limited, and to the treasurer of Lafayette county, Ark., to the detriment and to the exclusion of his other creditors, the act was in contemplation of bankruptcy. But it is not enough, to refuse his discharge, that he made the sale of his stock of merchandise "in contemplation of bankruptcy." It must also appear that in addition thereto he had, "with the fraudulent intent to conceal his true financial condition, failed to keep books of account or records from which his true condition might be ascertained."

The proof shows that R. R. Farrar, the county treasurer of Lafayette county, Ark., had deposited, of county funds, about $3,468.63 with the Citizens' Bank, which bank was the property of Morgan, and that Morgan had assumed to pay Hicks Company, Limited, about $900, which was due it from the firm of whom Morgan had bought both the bank and a small stock of merchandise, including a large amount of outstanding accounts. It further appears from the bankrupt's evidence that when he sold his stock of goods, wares, and merchandise to Millwee, who was a traveling salesman for a St. Louis firm, which firm was a creditor of Morgan, he sold it at 50 per cent. of cost and carriage, or about $4,100, and took in payment thereof two checks on banks,—one for about $2,703.09, and one for either $900 or $1,000,—and the balance, presumably, in cash. The former check, it appears from the bank books, was deposited in the bank to the credit of the Morgan store, and, according to the testimony of Morgan's bookkeeper, was turned over to the attorney of the treasurer of Lafayette county in part payment of Farrar's deposit with the bank. The other check was made payable to Hicks Company, Limited, and turned over to his agent at the time it was given, and no entry made of it on either the books of the bank or the store; nor does any entry appear in the books of the store with reference to the check which was turned over to the treasurer of Lafayette county. The sale of the stock of merchandise and the payment of these two debts (one debt by the bank, and the other by the store) were, to all intents and purposes, parts of a single transaction. Indeed, the sale was made, as above stated, in order that these two debts might be paid. They were important transactions, involving large sums. They were transactions in which the bankrupt's cred-

itors were interested. They were made in violation of the bankrupt law, and it is fair to assume, from the manner in which the transactions were had, and the purposes for which the sale was made, that the bankrupt did not intend that his creditors should know, from his books or otherwise, if he could avoid it, what had gone with the proceeds of his stock of goods. This view is fortified by the fact that the invoice of his stock of goods was taken in the night, and the delivery made early the next morning, and the bankrupt immediately disappeared,—he says, to avoid annoyance from his creditors. It is to be assumed that he did not care to face those from whom he had bought the goods which he had sold, under the circumstances stated, and which were not paid for, or to give an account of his conduct and business affairs. The real facts were not disclosed to his clerks in the bank, or, so far as the proof shows, to any one else. He had also concealed his store books at a place no one would be expected to inquire for them. Had they been found, however, they would have shown nothing of the transactions I have discussed. It is true, the bank books show that, on the same day the sale of the storehouse was consummated, there was deposited in the bank, to the credit of the storehouse, the amount of $2,703.09, evidently represented by the check given on the Camden bank, and which was turned over to the attorney for the treasurer of Lafayette county. There is nothing, however, in the books of either the store or the bank to show where the bankrupt got this money. It is a significant fact that, notwithstanding the bankrupt testifies that Millwee paid him in cash about $4,100 for this stock of goods, when the marshal seized the stock of goods in Millwee's possession as the property of the bankrupt, no claim has ever been set up for the same, or for the money which he says Millwee paid him for the stock of goods. The court is constrained to believe from the circumstances that either the money which the bankrupt claims Millwee paid him for the stock of goods was money given to Millwee by the bankrupt to disguise the transaction, or, if the money was in point of fact Millwee's money, that the bankrupt has, since the bankruptcy proceedings were instituted, restored to him the purchase price of the goods. It is almost incredible to believe that, if the transaction was a bona fide one, some claim would not have been set up by Millwee for that amount of money which has gone to pay the Hicks Company, Limited, and the treasurer of Lafayette county,—debts which the bankrupt owed to them. This view entertained by the court is strengthened by the fact that, notwithstanding the bankrupt was placed upon the witness stand to testify in regard to these transactions, he wholly failed to give any reasonable explanation of a deficit of at least $14,000 between his actual assets and his liabilities, the whole of which, so far as the proof shows, was contracted by him between February and November, 1898. His estate has not paid exceeding $6,500, and he owes over $19,000. There is no pretense in this case that the bankrupt kept any expense account,—an account which necessarily involves rents, freights, clerk hire, and many incidental expenses. There is no pretense that he kept any personal account. No accountant could take these books and ascertain from

them whether he had drawn out for personal expenses $1,000 or $10,000. In his efforts to explain the deficit in his assets, he has made no pretense that he lost money either by speculation or gambling, or by irregular habits of any kind. It must be assumed, therefore, in the absence of testimony, that the deficit cannot be accounted for upon the theory of either speculations, gambling, or vicious or irregular habits, since, if such were the case, it was an easy matter for the bankrupt to have accounted for losses sustained in that direction. It may be admitted that the business was recklessly conducted. The bankrupt himself testified that no entry was made of articles taken from the store and sent to his home for the support or maintenance of his family; that no entries were made of money taken from the drawers during the day for incidental expenses. He was engaged in purchasing cotton, and when money was taken from the drawer for cotton no entry was made thereof. No cotton account was kept, and there is nothing in the books to show whether he bought one bale or a thousand bales, or whether he lost or gained by reason thereof. And the significant fact in this connection is that, notwithstanding this sale took place in the very midst of the cotton season, not a bale of cotton was on hand, or, as far as the books show, had been consigned elsewhere for sale and not sold. The bankrupt is not an educated man, but he is an intelligent man. He has been in business of different kinds for eight years. He is not a bookkeeper, but he knows enough to know that if he had kept a correct cash account, a correct expense account, a correct merchandise account, a correct personal expense account, and a correct cotton account, the status of his business could have been easily ascertained. He pretended to keep a cash account in his store, but it was erroneous in many particulars, of which he was cognizant. He began keeping a personal expense account, but discontinued it. The other accounts he made no pretense of keeping, whatever. It is true that goods bought on time were credited to the merchant who sold them, in the individual account of that merchant, but no entry was made of either goods or cotton bought for cash. The entries of goods bought on time only showed what had not been paid for, but gave no idea of merchandise on hand, or goods or cotton paid for. True, an invoice of the stock might have been taken, and the bales of cotton on hand, if there had been any, might have been counted; but any quantity of goods might have been taken from the store, or cotton shipped, and no account given of either, and there was no possible way by which it could be detected through the books. If it had been the purpose of the bankrupt to prevent his creditors from ascertaining the condition of his business, no set of books which could be called a set of books at all, unless the entries they contained were purposely false, could have more completely compassed the result. And it must not be overlooked that there is an entire absence of evidence by those who kept the books of the store that the entries are correct. There is evidence that they are incorrect, or that the bankrupt has drawn out money of which he gives no account; for the cash account in the store shows that he took in $43,594.26, and only drew out $37,308.04, leaving a balance of cash on hand of

$6,286.22. No account is given of this sum. Counsel argue that it was deposited in the bank to the credit of the store, and was appropriated to pay the depositors of the bank. It seems, when Morgan opened the bank it had only $2,070 in cash, and it owed about $8,000 to depositors; but Millwee paid $4,100 to depositors, and $862.77 was collected from the old accounts of Connevey, McRae & Stinston, which accounts he bought from the last-named firm at the time he bought the bank and their stock of goods. One Wheat, who had a deposit of $500, has not been paid yet. These sums aggregate $7,462.77,—only lacking about $600 of enough to pay the depositors, without taking a dollar from the store. On this showing, it may be said that not a dollar of the proceeds of goods purchased after he bought the bank and the store of Connevey, McRae & Stinston went to pay depositors; for he got a stock of goods worth several thousand dollars from Connevey, McRae & Stinston, which was more than enough to have paid the deficit of $600 to the depositors, conceding the old accounts worthless. The bankrupt says that when he bought the bank the understanding was that there were only about $8,000 on deposit, and that it turned out that the claims of the depositors amounted to nearly $9,000; but the stock of goods which he bought from Connevey, McRae & Stinston was sufficiently large to cover that also, and still leave a surplus of goods, and the outstanding accounts of Connevey, McRae & Stinston on hand besides. The situation may be roughly summed up as follows:

| | | |
|---|---:|---:|
| He owes mercantile debts amounting to | | $14,975 42 |
| He owes Millwee | | 4,100 00 |
| Total | | $19,075 42 |
| His stock seized in the hands of Millwee, cost price | $ 8,248 56 | |
| Store accounts, uncollected at the sale, and made by him after he entered into business, about | 5,829 66 | |
| Total | $14,078 22 | 14,078 22 |
| Balance unaccounted for | | $ 4,997 20 |

It must not be overlooked that the $5,829.66 of store accounts were for goods sold on time, and, as the bankrupt himself testified, at a profit of not less than 33⅓ per cent.; and, moreover, that no profit realized on $45,000 of sales is taken into the account, as above stated. It is fair to assume that the profits realized on cash sales, and on credit sales which were collected, more than paid the firm and personal expenses, without reference to any profits realized on cotton, so that the deficit should be enlarged instead of reduced, especially when it is remembered that considerable sums have been proven against his estate, with his knowledge and approval, by his clerks, which properly belong to the expense account. The bankrupt was only in business about eight months, and his personal expenses, in a small country town, upon a liberal estimate, would scarcely exceed $1,000. An examination of his bank books does not relieve the situation. It will be assumed that the $2,128.87 appearing to Morgan's individual account on the books of the bank went to pay its depositors, although it does not appear that this balance was ever carried into Morgan's store account on the books of the bank. Mor-

gan's store account shows he deposited in the bank $43,594.25, which,
added to $2,128.87, makes a total of deposits by Morgan in the bank
of $45,727.13. The bank books show only $37,308.04 were drawn out
by Morgan; leaving a balance in the bank to his credit, both on ac-
count of the store and the bank, of $8,415.09. What became of this
money is not shown. The bookkeeper in the bank, conceded to be an
honest man, testified that the entries made were correct, and that
when the bank closed the bankrupt took the money,—how much, he
does not know. The bankrupt's schedules show only a nominal sum
in cash on hand from his bank and store at the time he quit business.
A recapitulation of his assets and liabilities in both store and bank,
as they appear on the books of the bank and store, shows:

Assets ................................................................. $21,035 25
Liabilities ........................................................... 15,748 20

Surplus .............................................................. $ 5,287 05

Of these assets, as shown by the books, $12,956.13 are gone, and
no account of them given, either on the books or otherwise; $5,829.66
are sundry uncollected accounts, of nominal value, for goods sold by
the store between February and November, 1898; $1,031 represents
overdrawn accounts, of what value it does not appear; while the
$15,748.20 in liabilities are mercantile debts and unpaid deposits, all
created during the eight months he was in business. I may sum it
up in this way: He started in business in February, 1898, with suf-
ficient assets, if properly handled, to pay the bank and store debts,—
certainly enough, and a surplus, if the $4,100 paid him by Millwee
be considered. He was in business only eight months. It is true,
the assets were not ready money, nor readily convertible into money,
but in goods, moneys, live stock, bank safe, fixtures, and open ac-
counts, bills receivable, and the like. He sold goods from which he
realized over $45,000. His profits on goods sold on credit, he said,
averaged 33⅓ per cent., and on cash sales 10 per cent. When he sold
out, in November, 1898, he had on hand goods and other property
which sold for about $5,500, and uncollected book accounts for goods
sold by him of $5,829.66,—the accounts representing goods sold at a
profit of 33⅓ per cent.,—and he owed mercantile debts, including the
money Millwee paid him, of $19,075.42. I cannot reconcile the con-
dition of things as stated above either with integrity of conduct or
purpose; nor can I, in view of these facts, believe that his books
were kept in the shape they were otherwise than with the intent to
conceal his true financial condition from his creditors. It is said that
the fact that he did not make proper entries upon his books when
he quit business was of no importance, and yet the very object which
the bankrupt law had in view, when it required books to be kept,
was that when a failure occurred the creditors might be able to as-
certain the true condition of the bankrupt. I am constrained to
find that his true financial condition cannot be ascertained from the
books and records kept by him, and that he has not accounted for or
turned over to his trustee all of his estate. What he has done with
it, or what disposition has been made of it, does not appear. The
discharge is refused on both the grounds above stated, and it is so
ordered.