EUCLID WILLIAMSON, THOMAS F. ECKERT, AND JOHN WILLIAM-
SON, PLAINTIFFS IN ERROR, *v.* ALEXANDER B. BARRETT,
ROBERT CLARK, NATHANIEL D. TERRY, HENRY LYNE, JAMES
T. DONALDSON, WILLIAM BROWN, AND JOHN B. SPROWLE.

The usage upon the River Ohio is, that when the steamboats are approaching each
other in opposite directions, and a collision is apprehended, the descending boat
must stop her engine, ring her bell, and float; leaving the option to the ascending
boat how to pass.

The descending boat was not bound to back her engines, and it was correct in the Cir-
cuit Court to refuse leaving to the jury the question whether or not, in fact, such back-
ing of the engines would have prevented the collision, where the ascending boat was
manifesting an intention to cross the river.

The proper measure of damages is a sum sufficient to raise the sunken boat, repair her
and compensate the owners for the loss of her use during the time when she was
being refitted.

THIS case was brought up by writ of error, from the Circuit
Court of the United States, for the District of Ohio.

It was an action of trespass on the case brought by the own-
ers of the steamboat Major Barbour, (the defendants in error,)
against the owners of the Paul Jones, another steamboat, for in-
juries resulting from a collision between the boats.

On the 3d of February, 1848, at a place upon the Ohio River,
about one hundred miles below Louisville, the Major Barbour
was descending the river, and a collision ensued between her and
the Paul Jones, which was ascending; by means of which the
Major Barbour became filled with water and sunk.

On the 17th of February, 1848, Barrett and others being citi-
zens of Kentucky, brought an action of trespass on the case,
against Williamson and the other owners of the Paul Jones, in
the Circuit Court of the United States, for the District of Ohio.

In October, 1849, the cause came on for trial upon the general
issue plea. The jury found a verdict for the plaintiffs for $6,714.29.
The following is the bill of exception taken upon the trial.

"Seventh Circuit Court of the United States, Ohio Dis-
trict, Alexander B. Barrett, Robert Clark, Nathaniel D. Terry,
Henry Lyne, James T. Donaldson, William Brown, John B.
Sprowle, *v.* Euclid Williamson, Thomas F. Eckert, John Wil-
liamson. Be it remembered, that on the trial of this cause,
evidence was given, showing that before and at the time
of the collision mentioned in the pleadings in this cause, the
plaintiffs' boat, the Major Barbour, was descending the Ohio
River, and the defendants' boat, the Paul Jones, was ascending
the same river, and heavily loaded, and the Major Barbour was
light, the Paul Jones being a much larger boat than the Major
Barbour.

It was claimed by the plaintiffs, and testimony offered by them,
tending to show that their boat was descending the middle

9*

of the river, and that the collision took place at or about the middle of the river.

It was claimed on the part of the defendants, and evidence was offered to show, that their boat was ascending near the Indiana shore, and that the plaintiffs' boat was also running near that shore, and that the collision took place near that shore. The plaintiffs also offered evidence tending to show that the Paul Jones, a short time before the collision, suddenly turned out of the Indiana shore, and ran across the river into the plaintiffs' boat; and the defendants offered evidence tending to show that the plaintiffs' boat, a short time before the collision, suddenly turned out from the Indiana shore, and crossed the bow of the Paul Jones.

Evidence was also given tending to show that the engines of the plaintiffs' boat were stopped, and the boat floated for some time previous to the collision; but it was admitted that she did not back her engines; and it was claimed by the plaintiffs that she was not bound by the rules or usages of navigation to back her engines.

Evidence was also given tending to show that the Paul Jones, some time previous to the collision, stopped her engines, and then reversed her engines to back the boat, and made from one to three revolutions back, and was actually backing at the time of collision.

And it was claimed by the plaintiffs, that their boat's engines were stopped, and the boat floating as soon as danger of collision was anticipated; and on the part of the defendants it was claimed, that the said Major Barbour's engines were not stopped sufficiently early, and that owing to that, and her not attempting to back her engines, she contributed to the collision.

The plaintiffs and defendants also offered evidence of pilots on the Ohio River, tending to show that boats navigating the Ohio River, were bound to observe the following rules in passing each other: The boat descending, in case of apprehended difficulty or collision, was bound to stop her engines, and float at a suitable distance, so as to stop her headway; and the boat ascending should do the dodging or manœuvring. And some of the pilots also testified, that it was also the duty of both boats to back their engines, so as to keep the boats apart when danger was apprehended, and to do all they could to prevent a collision; but the greater part of them said the rule of the river required the descending boat to stop its engines and float, being at the place of collision, near the middle of the river. And the defendants' counsel asked the court to instruct the jury that, if by backing the Barbour's engine, in addition to stopping and floating, the collision could have been avoided, and the plaintiffs did not back her engines, the plaintiffs could not recover, and that

Williamson et al. *v.* Barrett et al.

plaintiffs were bound to make use of all the means she had to prevent a collision. And thereupon the court charged the jury as follows:

That if the Major Barbour was in her proper track for a descending boat, as proved by several witnesses, near the middle of the river, and the Paul Jones in ascending the river was in her proper track, near the Indiana shore, and she turned out of her proper course, across the river, or quartering, in the language of some of the witnesses, so as to threaten a collision with the Major Barbour; and that as soon as this was discovered the Major Barbour stopped her engine, rang her bell, and floated down the stream, as the custom of the river required, leaving the ascending boat the choice of sides, and this was the law of the river, that on the near approach of the Major she was not required to back her engines, as that might bring her in contact with the other boat, but might presume that the Paul Jones did not intend to run into her, and that for an injury done to the Major Barbour under such circumstances, by the Paul Jones running into her, the plaintiffs are entitled to recover such damages, as appears from the evidence was done to the Major Barbour.

That if the Major Barbour turned out of her course, running near the Indiana shore, and this turning out of her course contributed to the collision, the plaintiffs could not recover. That where both boats were in fault, the plaintiffs could not recover. That in such case, the fault of the Major Barbour must be such as led to or contributed to the collision. That if the collision was the result of an unavoidable accident the plaintiffs could not recover.

That should the jury find for the plaintiffs, they will give damages which shall remunerate the plaintiff for the damages incurred, necessarily, in raising the boat, and in repairing her; and also for the use of her during the time necessary to make the repairs and fit her for business. That the jury were not bound to give interest, as claimed by the plaintiffs, but they would give such sum in damages as they shall deem just and equitable under the circumstances.

To which charge of the court, so far as it relates to charging that the Major Barbour was not required to back her engines, but might presume that the Paul Jones did not intend to run into her; and also to so much of the charge as directs the jury that they might give damages for the use of the boat during the time necessary to make the repairs and fit her for business; and also to the refusal of the court to charge or instruct the jury as requested, the defendants, by their counsel, except, and pray this their bill of exceptions may be signed and sealed, which is done and ordered to be made a part of the record.

JOHN McLEAN, [SEAL.]
H. M. LEAVITT, [SEAL.]

Upon this exception, the case came up to this court and was argued by *Mr. Chase* and *Mr. Lincoln*, for the plaintiffs in error, and by *Mr. Crittenden*, for the defendants in error. A brief was also filed by *Mr. Fox*, for the plaintiffs in error.

The counsel for the plaintiffs in error, contended that the action should have been "trespass" and not "trespass on the case," because the declaration charged the act to have been done by the defendants below, they being in possession of the boat at the time.

The counsel for the plaintiffs in error then contended, that there were errors in the instructions of the court, both as to the collision and the damages.

1. As to the collision, what was the question before the court below, and upon which the jury were to decide?

It was this. Was the defendants' boat navigated carelessly or unskilfully, and was the plaintiffs' boat from that cause injured. If so, did the plaintiffs in any way substantially contribute to such injury. The plaintiffs below were bound, 1st, to make out fault in those navigating the Paul Jones, directly causing their damage, and 2d, a freedom of those navigating the Major Barbour from any fault substantially contributing to the same.

If the plaintiffs below contributed in any way or to any extent, if they were in fault, although in a much less degree than the defendants, and such fault substantially contributed to the injury, they were not entitled to a verdict.

The judgment, if rendered, was to be for the whole damages, and the jury had no right to distinguish between the degrees of fault of the parties. Of this there is no dispute. I refer the court to a few of the many authorities upon the above position. Pluckwell *v.* Wilson, 24 E. C. L. Rep. 368; 5 Carr. & Payne, 375; Luxford *v.* Large, 24 E. C. L. Rep. 391; 5 Carr. & Payne, 421; Handyside *v.* Wilson, 14 E. C. L. Rep. 429; 3 Carr. & Payne, 527; Wolf *v.* Beard, 34 E. C. L. Rep. 435; 8 Carr. & Payne, 373; Sills *v.* Brown, 38 E. C. L. Rep. 248; 9 Carr. & Payne, 601; New Haven, &c. *v.* Vanderbilt, 16 Conn. Rep. 420.

There are numerous others to the same effect. There is nothing to be found in the books in opposition to the following statement of the law, taken from the case of Pluckwell *v.* Wilson, a case of collision between carriages:

"It is for the jury to say whether the injury to the plaintiff's chaise was occasioned by negligence on the part of the defendant's servants, without any negligence on the part of the plaintiff himself; for if the plaintiff's negligence were in any way concerned in producing the injury, he cannot recover."

Chancellor Kent very briefly states the rule thus : " But according to the English and American rules in the courts of common law, if there be fault or want of care on both sides, or the loss happen without fault on either side, neither party can sue the other." 3 Kent's Com. 5th Ed. 231.

The question to be tried, then, was one of negligence or want of care.

2. Upon the subject of damages, the counsel contended that the court erred in charging the jury that the plaintiffs below could recover for lost time or for compensation for the use of the boat while undergoing repairs, there being no allegation of such damages.

There are authorities against such damages in cases where the pleadings are properly framed.    Blanchard *v.* Ely, 21 Wend. 343 ; Boyd *v.* Brown, 17 Pick. 453 ; The Anna Maria, 2 Wheat. 327 ; The Amiable Nancy, 2 Wheat. 546 ; De Armistad de Rue, 5 Wheat. 385 ; Smith v. Condry, 1 How. 28 ; Conrad *v.* Pacific Insurance Company, 6 Pet. 262.

The case of Blanchard *v.* Ely, is direct to the point.

They are considered too speculative, or problematical.  The use of the boat might have been of benefit, or might have involved the plaintiff in trouble ; might have sunk them money by unprofitable business, or by a collision with some other boat, or she might have sunk by a danger of the river.   It is not at all certain that she would have been of any value to them.

I admit, however, that there are cases directly in opposition to Blanchard *v.* Ely.   But they are cases where there was a special allegation of such damages, and in that, the case before the court is distinguished from them.

There was such allegation in the case of New Haven Steamboat & Transp. Co. *v.* Vanderbilt, 16 Conn. 420.

Also in the cases of Haldeman *v.* Beckwith, which was before this court two years ago.   The declarations were so similar to these two cases, that I had that in the former case printed for the use of this court, when the case of Haldeman *v.* Beckwith was before them.   See Appendix, A.   In the report of the case in the 16th Conn. it does not appear that there was a special allegation of loss of time, and that the declaration gave the party direct notice of his claim.   But there was such allegation.

Such damages could not be recovered in this case, unless it be what the law denominates general damages.

The object of pleading is to give notice to the other party of the claim set up, that he may come prepared to defend it ; and nothing can be recovered but that which naturally and necessarily flows from what is alleged.

From the declaration in this case, no one would suppose, that

any thing but a total loss of the boat would be claimed.    An entirely different claim was, however, interposed.

In case of a total loss, the value of the boat is the rule of damages.    The Apollon, 9 Wheat. 362.

Now the expense of raising and repairing the boat, with compensation for lost time, may have been much greater than the whole value of the boat.

If that be the claim set up, the party would come prepared with evidence, as to these points: was it prudent to raise and repair her? was not the party too long in doing it? did he not pay too much? and was not the value for use of the boat, as given in evidence by him, greater than it really was?

These considerations show, I think, that the allegation for a total loss does not necessarily or naturally include the damages allowed.

(Upon both of the above points, the arguments of the counsel were very elaborate.)

Mr. Justice NELSON delivered the opinion of the court.

This is a writ of error to the Circuit Court of the United States for the District of Ohio.

The plaintiffs in the court below, the defendants here, who were the owners of the steamboat Major Barbour, brought an action against the defendants, the owners of the steamboat Paul Jones, to recover damages occasioned by a collision upon the Ohio River on the 3d February, 1848.

The Major Barbour was descending the river at the time, and the Paul Jones ascending, the latter heavily laden and of much larger size than the former.

Evidence was given by the plaintiffs tending to show, that their boat was about in the middle of the river at the time the collision took place; that the defendants' boat was ascending the Indiana shore, and that a short time before the collision she suddenly changed her course and left the shore, running across the river into the Major Barbour, causing the damage in question.    While on the part of the defendants, it was claimed, and evidence given to show, that the plaintiffs' boat was descending near the Indiana shore, and that the collision occurred near that shore, and that the plaintiffs' boat a short time before it happened suddenly turned out from the shore and ran across the bow of the Paul Jones, causing the damage.

Evidence was also given tending to show that the engine of the plaintiffs' boat was stopped, and the boat floated as soon as the danger was discovered, and for some time previous to the collision, but, it was admitted she did not back her engines, and it was claimed that she was not bound to do so, according to

the rules and usages of the navigation. While, on the part of the defendants, it was claimed, and evidence given to show, that the Paul Jones, some time before the collision, stopped her engines, and reversed the same to back the boat, and had made from one to three revolutions back, and was actually backing at the time of the collision; and also that the engines of the plaintiffs' boat were not stopped sufficiently early, and owing to that, and not attempting to back her engines, she contributed to the collision.

Evidence was further given tending to show, that boats navigating the Ohio river were bound to observe the following rules in passing each other: The boat descending, in case of apprehended difficulties, or collision, was bound to stop her engines, and float, at a suitable distance, so as to stop her headway; and the boat ascending, to make the proper manœuvre to pass freely.

When the evidence closed, the counsel for the defendants requested the court to instruct the jury, that the plaintiffs ought not to recover, if the collision could have been avoided by reversing the engines and backing their boat, in addition to stopping and floating; and, that the master was bound to use all the means in his power to prevent a collision.

And thereupon, the court among other things charged, that if the Major Barbour was in her proper track for a descending boat, near the middle of the river, and the Paul Jones in ascending the river was in her proper track near the Indiana shore, and the latter turned out of her proper course across the river or quartering, as stated by some of the witnesses, so as to threaten a collision; and that as soon as discovered, the Major Barbour stopped her engine, rang her bell, and floated down the stream, as the custom of the river required, leaving the ascending boat the choice of sides to pass her, and this being the law of the river, she was not, on the near approach of the boat, required to back her engine, as that might bring her in contact with the other boat. She had a right to presume the Paul Jones did not intend to run directly into her. And that, if any injury was done to the Major Barbour, the plaintiffs' boat, under such circumstances, by the Paul Jones running into her, the plaintiffs were entitled to recover.

The court further charged, that, if the jury should find for the plaintiffs, they ought to give such damages as would remunerate them for the loss necessarily incurred in raising the boat, and in repairing her; and also for the use of her during the time necessary to make the repairs, and fit her for business.

I. As to the first branch of the instruction. In order properly to appreciate it, it is material to notice the relative position of

the two boats at the time of the collision, which is assumed in the instruction, and in respect to which circumstances it was given, and, as claimed by the plaintiffs, the jury would be warranted in finding. For, the principle stated was not laid down as an abstract proposition, or rule of navigation, but one applicable to the state of the case specially referred to as supposed to have been made out upon the evidence.

The case was this: The plaintiffs' boat was in her proper track, descending the river near the middle, while the defendants' was ascending the same in her proper track near the Indiana shore. And as the boats were approaching each other in this relative position, the Paul Jones, the defendants' boat, changed her course across the river towards the middle of the same, somewhat in an oblique direction according to some of the witnesses, and thereby endangering a collision. That as soon as this was discovered, the Major Barbour, the plaintiffs' boat, stopped her engine, rang her bell and floated, as the custom of the navigation required, leaving to the other boat the option to pass either her bow, or stern.

It was upon this state of facts, the court instructed the jury that the plaintiffs' boat was not bound to make the additional manœuvre of backing her engines, as that might, under the circumstances, have brought about the collision she was endeavoring to avoid; and, that for the injury done by the Paul Jones running into her, the plaintiffs' were entitled to recover.

The counsel for the defendants had requested the court to instruct the jury, that, if the plaintiffs' boat by backing her engines in addition to stopping, and floating, could have avoided the collision, she was bound to do so, and the defendants were not liable, as the master was responsible for the use of all the means in his power to prevent it. And the error, supposed to have been committed, consists in the refusal to give this instruction, under the peculiar circumstances of the case, and in giving that which we have stated.

It is not to be denied, that the Major Barbour, according to the position of the boats as assumed in the instruction, had observed strictly the custom, and usages of the river. But it is claimed, that a state of facts had occurred from the position of the Paul Jones, whether by the fault of those in command or not, that made it the duty of the master of the plaintiffs' boat not sternly to have adhered to this usage, but, to have made the movement insisted upon, if by so doing the accident could have been avoided. This position is founded upon an exception to the general law of the navigation as modified by the circumstances of the particular case, by which the master of the vessel not in fault is bound to make every fair and reasonable effort,

in the emergency, within his power, from due exercise of skill and good seamanship, to avoid, if possible, the impending calamity. Upon the water as upon the land, the law recognizes no inflexible rule, the neglect of which by one party, will dispense with the exercise of ordinary care and caution in the other. A man is not at liberty to cast himself upon an obstruction which has been made by the fault of another, and avail himself of it, if he does not use common and ordinary caution to avoid it. One person being in fault will not dispense with another's using ordinary care for himself.

And, undoubtedly, if a state of facts had been shown in this case, arising out of the circumstances attending the sudden change of the course of the Paul Jones, from which an inference might fairly have been drawn, that it was the duty of the master of the Major Barbour not only to have stopped her engines, but to have reversed them, and backed his boat, in order to avoid the danger, and, that by so doing it might have been avoided, the point should have been put to the jury, with the instruction, if they so found, the plaintiffs could not recover. Before, however, any such instruction could be properly claimed, the defendants must have made out a state of the case to which it was applicable, and from which the omission to make the movement laid a foundation for the inference of fault on the part of the Major Barbour.

The fact that it would have prevented the catastrophe is not enough; circumstances must be shown that would make it the duty of the master to give the order.

There is no rule of law or of the river that imposes upon him, in such an emergency, the obligation, to give a particular direction to his vessel, simply because it might avoid the danger. The question in all such cases is, whether, in the exercise of due care and caution in the management of her at the time in any given case, such a direction should have been given. If it should, then he is chargeable with the consequences of the neglect.

Applying these principles to the state of facts in respect to which the instruction in question was given, we think it will be found that no error was committed.

The defendants' boat had suddenly turned out of the accustomed track, which was along the Indiana shore, apparently for the purpose, if she had any in view, of crossing to the other side; and, as soon as this change was discovered, the engines of the descending boat, were stopped, allowing her to float according to the usage in such cases, for the purpose of enabling the other to pass across her bow or stern, as she might elect.

Now, it could not be known, at least there is nothing in the

case to show that it was known to the master of the descending boat, which of the two courses open to her the other intended to adopt. If she determined to pass his bow, undoubtedly, reversing the engines and backing his boat would have been a very proper manœuvre; but if she determined to cross his stern, the movement would have been improper, and might have been disastrous. Either a forward or backward movement under the circumstances would have embarrassed the operations of the other boat, as the master had a right to assume the one descending would adhere to the usage of the river, and leave him free to make choice of his course in passing upon that assumption.

Under these circumstances, we think it clear it would have been erroneous to have instructed the jury, that the master of the Major Barbour was bound not only to stop her engines, but to back her, if, by so doing, the danger could have been avoided. For before the neglect to make that movement could be charged as a fault, it should have appeared that the master knew the colliding boat intended to pass her bow. In the absence of such knowledge, her proper position was that which the usage of the river prescribed, namely, to stop her engines and float, leaving the other the choice to pass across either her bow or stern. This was his plain duty, not only from the law of the river, but due, under the circumstances, to the other boat, as affording her the most favorable opportunity to extricate herself from the danger in which she had become involved by her own fault in carelessly leaving her proper track.

II. As to the question of damages.

The jury were instructed, if they found for the plaintiffs, to give damages that would remunerate them for the loss necessarily incurred in raising the boat, and repairing her; and also, for the use of the boat during the time necessary to make the repairs, and fit her for business.

By the use of the boat we understand what she would produce to the plaintiffs by the hiring or chartering of her to run upon the river in the business in which she had been usually engaged

The general rule in regulating damages in cases of collision is to allow the injured party an indemnity to the extent of the loss sustained. This general rule is obvious enough; but there is a good deal of difficulty in stating the grounds upon which to arrive, in all cases, at the proper measure of that indemnity.

The expenses of raising the boat, and of repairs may, of course, be readily ascertained, and in respect to the repairs, no deduction is to be made, as in insurance cases, for the new materials in place of the old. The difficulty lies in estimating the damage sustained by the loss of the service of the vessel while she is undergoing the repairs.

That an allowance short of some compensation for this loss would fail to be an indemnity for the injury is apparent.

This question was directly before the court of admiralty in England, in the case of the Gazelle, decided by Dr. Lushington, in 1844. 2 W. Robinson, 279. That was a case of collision, and in deciding it, the court observed, "that the party who had suffered the injury is clearly entitled to an adequate compensation for any loss he may sustain for the detention of the vessel during the period which is necessary for the completion of the repairs, and furnishing the new articles."

In fixing the amount of the damages to be paid for the detention, the court allowed the gross freight, deducting so much as would, in ordinary cases, be disbursed on account of the ship's expenses in earning it.

A case is referred to, decided in the common-law courts, in which the gross freight was allowed without any deduction for expenses, which was disapproved as inequitable and exceeding an adequate compensation, and the qualification we have stated laid down.

This rule may afford a very fair indemnity in cases where the repairs are completed within the period usually occupied in the voyage in which the freight is to be earned. But, if a longer period is required, it obviously falls short of an adequate allowance. Neither will it apply where the vessel is not engaged in earning freight at the time. The principle, however, governing the court in adopting the freight which the vessel was in the act of earning, as a just measure of compensation in the case, is one of general application. It looks to the capacity of the vessel to earn freight, for the benefit of the owner, and consequent loss sustained while deprived of her service. In other words, to the amount she would earn him on hire.

It is true, in that case, the ship was engaged in earning freight at the time of the collision; and the loss, therefore, more fixed, and certain than in the case where she is not at the time under a charter-party, and where her earnings must in some measure depend upon the contingency of obtaining for her employment. If, however, we look to the demand in the market for vessels of the description that has been disabled, and to the price there, which the owner could obtain or might have obtained for her hire as the measure of compensation, all this uncertainty disappears. If there is no demand for the employment, and, of course, no hire to be obtained, no compensation for the detention during the repairs will be allowed, as no loss would be sustained.

But, if it can be shown, that the vessel might have been chartered during the period of the repairs, it is impossible to deny that the owner has not lost in consequence of the damage, the amount which she might have thus earned.

The market price, therefore, of the hire of the vessel applied as a test of the value of the service will be, if not as certain as in the case where she is under a charter-party, at least, so certain that, for all practical purposes in the administration of justice, no substantial distinction can be made. It can be ascertained as readily, and with as much precision as the price of any given commodity in the market; and affords as clear a rule for estimating the damage sustained on account of the loss of her service, as exists in the case of damage to any other description of personal property, of which the party has been deprived.

In the case of the Gazelle, for ought that appears, the allowance of the freight afforded a full indemnity for the detention of the vessel while undergoing the repairs. This would be so, as already stated, if they were made within the period she would have been engaged in earning it. If it were otherwise, it is certain, that the indemnity allowed fell short of the rule laid down under which it was made, which was, that the party was entitled to an adequate compensation for any loss he might sustain for the detention of the vessel during the period which was necessary for the completion of the repairs and furnishing the new articles.

The allowance of the freight she was earning at the time was but a mode of arriving at the loss in the particular case under the general rule thus broadly stated; and afforded, doubtless, full indemnity.

We are of opinion, therefore, that the rule of damages laid down by the court below was the correct one, and is properly applicable in all similar cases. There was no question made in respect to the freight of the vessel, and hence the general principle stated was applicable, irrespective of this element, as influencing the result.

There were some other questions raised in the case of a technical character, and urged on the argument. But we deem it sufficient to say, that they are so obviously untenable, that it is not important to notice them specially.

We are of opinion, therefore, the judgment of the court below was right, and should be affirmed.

Mr. Justice CATRON dissented, with whom Mr. Chief Justice TANEY, and Mr. Justice DANIEL concurred.

Mr. Justice CATRON.

This action is one of owners against owners of respective steamboats. It is an action on the case, in which no vindictive damages can be inflicted on the defendants, as they committed no actual trespass; and therefore, in assessing damages against them, moderation must be observed.

In the next place, the collision occurred on the Ohio River, and the rules of law applicable to the controversy must accommodate themselves to that navigation.

The injured boat was sunk, and the plaintiffs declared for a total loss; but it came out in evidence, that she was raised and repaired, and again commenced running the river. On this state of facts the jury was charged: 1st. That damages should be given for raising the boat: 2d. For repairing her: and 3d. Also damages in addition, " for her use, during the time necessary to make the repairs and fit her for business."

The expression " for her use," must mean either the clear profits of her probable earnings; or, how much she could have been hired for to others during the time of her detention. Both propositions come to the same result, to wit: how much clear gains the owners of the Major Barbour, could have *probably* made by their boat, had she not been injured, during the time she was detained in consequence of being injured. This probable gain, the jury was instructed to estimate as a positive loss, and to charge the defendants with it.

The suit is merely for loss of the boat, and has no reference to the cargo. It does not appear that she had either cargo, or passengers; nor does the evidence show in what trade she was engaged.

In cases of marine torts, no damages can be allowed for loss of a market; nor for the probable profits of a voyage. The rule being too uncertain in its nature to entitle it to judicial sanction. Such has been the settled doctrine of this court for more than thirty years.

In the case of the Amiable Nancy, 3 Wheat. 560, when discussing the propriety of allowing for probable loss of profits on a voyage that was broken up by illegal conduct of the respondents' agents, this court declared the general and settled rule to be, that the value of the property lost, *at the time of the loss;* and in case of injury, the diminution in value, by reason of the injury, with interest on such valuation, afforded the true measure for assessing damages: " This rule," says the court, " may not secure a complete indemnity for all possible injuries; but it has certainty, and general applicability to recommend it, and in almost all cases, will give a fair and just recompense." And in the suit of Smith *v.* Condry, 1 How. 35, it is declared, that in cases of collision " the actual damage sustained by the party, at the *time* and *place*, of the injury, is the measure of damages." In that case there was detention as well as here, but it never occurred to any one, that loss of time could be added as an item of damages. In other words, that damages might arise after

10*

the injury and be consequent to it; and which might double the amount actually allowed.

The decision found in 3 Wheat. was made in 1818, and I had supposed for many years past, the rule was established, that consequential damages for loss of time, and which damages might continue to accrue, for months after the injury was inflicted, could not be recovered; and that there was no distinction in principle, between the loss of the voyage, and loss of time, consequent on the injury.

The profits claimed and allowed by the Circuit Court, depended on remote, uncertain, and complicated contingencies, to a greater extent, than was the case, in any one instance, in causes coming before this court, where a claim to damages was rejected for uncertainty.

Here, full damages are allowed for raising the boat, and for her repairs. To these allowances no objection is made; it only extends to the additional item for loss of time. That the investigation of this additional charge will greatly increase the stringency, tediousness, and charges of litigation, in collision cases, is manifest; nor should this consideration be overlooked. The expense and harassment of these trials have been great when the old rule was applied; and, the contest, if the rule is extended, must generally double the expense and vexation of a full and fair trial. Nor will it be possible, as it seems to me, for a jury, or for a court (where the proceeding is by libel) to settle contingent profits, on grounds more certain, than probable conjecture. The supposition that the amount of damages can be easily fixed, by proof of what the injured boat could have been hired for on a charter-party, during her detention, will turn out to be a barren theory, as no general practice of chartering steamboats, is known on the western rivers, nor can it ever exist; the nature of the vessels, and the contingencies of navigation being opposed to it. In most cases, the proof will be, that the boat could not have found any one to hire her; and then, the contending parties will be thrown on the contingency, whether she could have earned something, or nothing; little, or much, in the hands of her owner, during the time she was necessarily detained; and this will involve another element of contention of great magnitude; to wit, whether she was repaired in reasonable time. Forasmuch as no necessity will be imposed on the owner to bestow the repairs, as is now the case, he will rarely, if ever, do so; and having the colliding boat and her owners in his power, gross oppression will generally follow, in applying this new and severe measure of damages to western river navigation.

In a majority of cases of collision on the western waters, par-

tial injury, repairing, and detention of the injured boat occur. Contests before the courts have been numerous where the precise question of compensation here claimed was involved, and yet in an experience of twenty-five years, I have never known it raised until now. The bar, the bench, and those engaged in navigation, have acquiesced in the rule, that full damages for the injury at the time and place when it occurred, with legal interest on the amount, was the proper measure; nor do I think it should be disturbed; and that therefore the judgment of the Circuit Court should be reversed, because the jury were improperly instructed, in this particular.

## *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States, for the District of Ohio, and was argued by counsel. On consideration whereof, it is now here ordered, and adjudged, by this court, that the judgment of said Circuit Court, in this cause, be, and the same is hereby affirmed with costs, and damages at the rate of six per centum, per annum.