BRENT v. THORNTON et al.

(Circuit Court of Appeals, Fifth Circuit. January 8, 1901.)

No. 975.

1. DAMAGES—EVIDENCE—ILLEGAL SEIZURE OF TUG.

On the question of damages for seizure and detention of a tug by a collector of customs, it being allowed during the period of its detention to do work only within the harbor, testimony of a witness that he was pretty sure there were lots of opportunities during that time to do outside work, and that after its release, when it could do outside work, its average earnings were a certain amount more per day, is objectionable as speculative and contingent; as is also testimony that it and three other boats had an agreement to work jointly in pulling off vessels that went aground, and during that time the other boats pulled off a vessel, receiving $1,500 therefor, and, if it had not been detained, it would have received a quarter thereof.

2. INTEREST—ON DAMAGES.

The question of allowance of interest on damages for tort is for the jury. They should not be directed to allow it.

In Error to the Circuit Court of the United States for the Northern District of Florida.

H. H. Thornton and Ben De Rocheblave, the defendants in error, brought their action against D. G. Brent, the plaintiff in error, to recover of him damages for the alleged wrongful seizure and detention of the steam tug Monarch, of which they were the owners. It is unnecessary to recite the counts of the declaration. The plaintiff in error, who was the defendant in the court below, was, on April 5, 1897, collector of customs of the port of Pensacola. On that date the tug Monarch arrived in that port, and. acting under instructions from the secretary of the treasury, the plaintiff in error seized the papers of the tug, and put a custom-house officer on board; the ground for this action being that the papers were illegal, or at least irregular, by reason of the want of a correct representation as to the ownership of the boat when the papers were issued. This alleged defect was corrected by the defendants in error, but the plaintiff in error continued still to hold the tug, and refused to deliver the papers, and detained the tug idle at the wharf in Pensacola Harbor until April 20, 1897, when an agreement was made between the plaintiff in error and the defendants in error, by which the Monarch was allowed to work inside of Pensacola Harbor, with the understanding that a custom-house officer was to remain on board; and the expenses of this officer, amounting to three dollars per day and board, were to be paid by the defendants in error, if required to do so. They were required to pay the three dollars per day salary for the custom-house officer, and also to board him during the time at a cost of fifty cents to one dollar a day. Upon the making of this agreement the Monarch went to work, under a charter with Rittenhouse & Moore, towing and dredging inside Pensacola Harbor, by the terms of which her net earnings were about $50 a day. She continued to work under this charter up to May 22, 1897. The Monarch was of the value of $20,000, and at the time of the trial was at work under contract at Tampa, Fla., making net earnings of $45 a day. The case came to trial on May 16, 1900, which resulted in the following verdict: "We, the jury, find for the plaintiff, and assess the damages at $1,617.39 and $388.17 interest,"—upon which the court entered judgment as follows: "Whereupon it is considered, ordered, and adjudged by the court that the plaintiffs, H. H. Thornton and Ben De Rocheblave, have and recover of and from the defendant, D. G. Brent, the sum of sixteen hundred and seventeen dollars and thirty-nine cents ($1,617.39) as damages, and the further sum of three hundred and eighty-eight dollars and seventeen cents ($388.17) as interest, and the further sum of thirty-six dollars and twenty cents ($36.20) as the taxable costs herein." The assignment of errors embraces seven spec-

ifications, only three of which are noticed in the opinion; namely, the fourth, fifth, and sixth, which are as follows: "(4) The refusal of the court to strike out from the evidence of H. H. Thornton and exclude from the jury the testimony of said Thornton tending to prove that plaintiff's, if permitted by defendant, could have earned with the tug Monarch the sum of $375 by assisting in pulling off the Russian ship Pandion, then aground on Pensacola bar. (5) The refusal of the court to strike from the evidence of H. H. Thornton and exclude from the jury the testimony of said Thornton tending to prove that the tug Monarch could have averaged $12.33 more per day in earnings if said boat had been permitted to work outside Pensacola Harbor. (6) The court erred in charging the jury as follows, to wit: 'That upon the amount of damages you find for the plaintiff you will allow three years' interest thereon, at 8 per cent. per annum.'"

W. W. Howe and John Eagan, for plaintiff in error.

W. A. & A. C. Blount, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge, after stating the case, delivered the opinion of the court.

The fourth, fifth, and sixth errors assigned are well taken. The testimony of the defendant in error H. H. Thornton, which the plaintiff in error moved to have stricken out on the trial in the court below, was as follows:

"While the Monarch was tied up at the wharf by orders of the defendant below, she had an opportunity to engage, with three other tugs, in pulling off the Russian ship Pandion, which went aground on Pensacola bar. Four tug boats, including the Monarch, of the harbor of Pensacola, had an agreement to work jointly on every ship that went aground, and divide the profits. One boat could not do the work. When the ship went ashore at the time mentioned, witness was asked to have the Monarch assist in getting her off, and he requested permission of the defendant, and was refused. She went ashore, and the work was performed while the Monarch was tied up by the defendant. The amount paid for the service was $1,500, and the Monarch would have earned, by performing her share of the service, $375. This would have been in addition to the amounts which witness testified would have been earned by the Monarch while tied up."

Upon cross-examination the witness testified that he did not know the terms of the contract, nor whether payment depended on succeeding in pulling the vessel off, but that Bob Hyer made the contract, and witness thinks it was he who said, "We want you to go down, and get her off," and told witness that the price was $1,500; that witness knows the vessel was pulled off. In pulling vessels off the bar towboats have to wait for high tides sometimes 12 hours and sometimes 24 hours, as tides do not run regular. Witness has known vessels pulled off the bar when it took several days to do it, and a good deal of work. When doing this kind of work the tugboat pays all of its own expenses, and whatever the expenses would have been would have had to be paid out of the $375, as that was the gross sum the Monarch would have received. Upon redirect examination the witness testified that the work was actually done by the three other tugboats, and the amount actually paid, and that the Monarch, if she had not been detained by defendant, would have got $375, which she did not get. This testimony the plaintiff in error moved to strike out on the ground that it was uncertain and speculative; that the $375 which it was claimed that the Monarch would

have earned by assisting in pulling off such vessel was uncertain, and speculative, and too remote. The same witness further testified:

"That on April 20, 1897, to May 22, 1897, the Monarch worked inside Pensacola Harbor under charter party with Rittenhouse & Moore, and during said period of time a custom-house officer was stationed on board, and the tug was not permitted to work outside the harbor during said time; that by arrangement with the charterer which witness had the Monarch could have worked outside by securing another boat to do this inside work; that witness was pretty sure that there were lots of opportunities during said time to do outside work; that after the Monarch was released, and up to October, 1898, witness had the same arrangement with Moore, and during said period did much work outside, and such work is included in the statement of profits during that period, and that the average earnings for inside and outside work together was $12.33 per day more than for inside work alone."

This testimony relating to the $12.33 per day as excess of outside earnings of said boat the defendant moved to strike out, for the reason that the evidence showed that the Monarch was engaged and employed under charter for inside work, and did not show any opportunity to do outside work. In our opinion, the trial court erred in overruling the motions to strike out the foregoing testimony. Counsel for the defendants in error insist that, even if the testimony is subject to valid objections, the grounds stated in the motions to strike out are not sufficient to support those motions; and he makes an ingenious argument in presenting this contention. Opinion testimony as to the probability of employment, and the amount of the earnings if employed, is too speculative and contingent to be the foundation of any rule of damages. The language of Mr. Justice Nelson in the case of The R. L. Maybey, 4 Blatchf. 440, Fed. Cas. No. 11,871, is very pertinent to the case before us. He says:

"It is, at best, but conjecture. The true question within the case of Williamson v. Barrett, 13 How. 101, 112, 14 L. Ed. 68, was, what could the tug have been chartered for per day in the business of towing, regard being had to the market price in the city of New York? This would have brought the question down to some degree of certainty, and afforded ground for an intelligible allowance, or not, of the loss which the libelant had actually sustained by the delay during the repairs."

In this case the tug was under charter for the performance of work inside the harbor during the most of the period covered by the claim for damages. The other testimony in the case shows that at the time of the trial she was under charter in another port in Florida at a price that netted the owners less than they received under the charter to Rittenhouse & Moore while the inspector was on board. The witness says that by getting some other boat to do the work that his tug was doing for Rittenhouse & Moore he could have used his tug outside as opportunity offered, and that he was certain that many opportunities offered during that time that he could have availed of if his tug had been free to work outside. This is a general statement, gives no specification of any opportunity that actually did offer, and brings his testimony fully within the criticism of Mr. Justice Nelson in The R. L. Maybey Case.

The testimony with reference to the $375 which the witness claims his tug could have earned in assisting to pull off the Russian ship Pandion, is not quite as objectionable as the other. But it is a differ-

ence in degree, and not in kind. The elements of uncertainty and the speculative features are there, though not quite so prominent. Cases do arise in which it is proper to show that the parties were prevented from rendering service which they were under contract to perform or to be allowed to do, and for the doing of which it was in the contemplation of the parties that they would earn and receive a profit. But this case does not fall within that class.

On the trial of the case, the judge instructed the jury "that upon the amount of damages you find for the plaintiff you will allow three years' interest thereon at 8 per cent. per annum." In Lincoln v. Claflin, 74 U. S., on page 139, 19 L. Ed. 109, it is said:

"Interest is not allowable as a matter of law, except in cases of contract, or the unlawful detention of money. In cases of tort its allowance as damages rests in the discretion of the jury."

The matter thus being in the discretion of the jury, if they had, under a proper instruction, returned the verdict in the terms in which it was rendered in this case, it would not have been subject to objection, because the two sums added together would have shown distinctly the damage found by the jury. But the matter of interest should have been left to the discretion of the jury. They might have been charged that they could take into consideration the time intervening from the commission of the tort to the rendering of their verdict, if, in their judgment, the circumstances of the case so required. It was one element of damage that they had a right to consider, and it was their province to consider it, and to pass upon it, and was not the province of the court to decide, as matter of law, that the party was entitled to interest on the amount the jury should find they were damaged by the detention of their boat. It was submitted by counsel for the defendants in error that, if this were the only error committed by the judge, the judgment could be corrected by a remittitur. That is true, but, as the other errors require that the judgment should be reversed, and it is impossible for the court to determine what part of the principal damages found by the jury were given on the testimony which should have been excluded, the error of the court in admitting that testimony cannot be cured by a remittitur. It is therefore ordered that the judgment of the circuit court be reversed, and the cause remanded, with direction to award the defendant therein a new trial.