### THE L–1.
### THE PHILADELPHIA.

### UNITED STATES v. DELAWARE BAY & RIVER PILOTS ASS'N.

#### No. 289 of 1923.

District Court, E. D. Pennsylvania.
Jan. 9, 1935.

J. Frank Staley, Asst. Atty. Gen., and Charles D. McAvoy, U. S. Atty., of Philadelphia, Pa., for the United States.

Otto Wolff, Jr. (of Lewis, Wolff & Gourlay), of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

The submarine L–1, a vessel of the United States Navy, was damaged in a collision with the respondent's ship on February 2, 1921. Liability for the accident has been finally fixed upon the respondent. The report of the Commissioner appointed to ascertain and compute damages is now before the court upon exceptions.

The Commissioner in his report has dealt accurately and exhaustively with the facts and I shall not attempt to review the whole case. The fact findings of the report are supported by competent evidence and are all affirmed.

Two important questions of law are here involved: First, whether, in view of the physical condition and status of the submarine at the time of the collision, the libelant has suffered any compensable damage at all other than small items of temporary repair, seamen's wages, and subsistence and salvage expenses. Second, whether, assuming the estimated cost of permanent repairs to be a proper item, there should have been included in it an item of overhead, referred to throughout as the "indeterminate."

I. As to the first question: The L–1 had been built in 1914 at an approximate cost of $617,000 and had been in service about six years. She was one of a group of seven submarines of similar design—a type which was nearly, but not quite, obsolete in 1921. At the time of the accident she was proceeding to Philadelphia, where she was to be kept "in inactive status with just sufficient personnel from the Repair Division at Philadelphia to prevent deterioration."

After the collision she was beached and subsequently towed to the Philadelphia Navy Yard, temporary repairs having been made to prevent her from sinking. No other repairs were ever made. She remained at the Navy Yard out of commission until July 31, 1922, when she was sold as junk for $4,168. The item of the libelant's claim now in dispute is the estimated cost of permanent repairs to her hull.

The respondent's contention is that upon the day of the collision the L–1 had nothing more than her junk value, and of course this value was not affected by the damage done.

The condition of the L–1 and the best course to take with regard to her from the standpoint of economy and the needs of the service had been matters of concern to the Navy Department for some time. During the year preceding the collision six official navy groups or authorities had passed upon her and made reports and recommendations. Without reviewing these at length, it may be said that the net result of the whole is that:

(a) Her engines were entirely worn out and she could not be used for service of any kind unless and until she was re-engined and certain other necessary repairs or replacements made. This would have cost from $227,000 to $312,000 depending upon the kind of new engines installed.

(b) If re-engined, she would in all probability have been useful for two or three years for certain types of service with a limited, but none the less appreciable, military value.

(c) Whether or not, as things stood at the time of the collision, the money necessary to re-engine the L–1 could have been spent to greater advantage as part of the price of a new submarine or for some other purpose cannot be determined as a fact. The Navy Department thought that it would pay to spend the money and keep the vessel in commission for two or three years and so recommended. As it later turned out, Congress thought otherwise and the necessary money was never appropriated.

██ In this situation, I think the Commissioner was right in finding that the L–1 had a value as a serviceable war vessel which was in excess of what she was worth as junk. The fact that this value was potential and required the expenditure of money to make it available to the owner does not mean that it was not there. Nor is the found fact that the owner subsequently determined not to spend the necessary money conclusive against its existence at the time in question, although the failure of Congress to appropriate the money might be considered in the nature of an admission against it. But, on the other hand, there are so many other elements which may have entered into the final decision not to make the expenditure (subsequent changes in military plans, new developments in submarine construction, state of government finances) that, even for such purpose, it is of very little value.

Too much can be made of the worn-out condition of the engines. It happens in this case that this was a replacement which would cost a large amount of money. But it is just as easy to imagine a situation where the necessary replacement would be quite small and yet be just as necessary in order to realize the potential value of the vessel. For example, a comparatively small but absolutely essential part, without which a ship would be entirely unserviceable, might be worn out or missing. Yet no one would contend that the ship therefore had no value. And it might also occur that subsequent events, possibly to-

tally unforeseen, would transpire which would make it inadvisable to make even this small replacement. In such case, obviously, the failure to do so would be very slight evidence of absence of value at an earlier date.

The essential fact finding is that the L–1, re-engined and reconditioned, would have been worth more than the cost of the re-engining and reconditioning, and I so find. In other words, the owner had a margin of value in the vessel which it could realize by spending some money. Whether the margin was large or small is immaterial. The damage done by the collision impaired this marginal value. The owner is entitled to have it restored by the wrong-doer, and the cost of necessary repairs is the proper measure of recovery.

 II. The indeterminate charge disallowed by the Commissioner was nothing but an allocation of certain items of shop overhead to the total estimated cost of the repairs. The Commissioner allowed it in connection with the temporary repairs actually made, but disallowed it as part of the estimated cost of permanent repairs not made. Necessarily, since the job was never undertaken, it was calculated upon shop experience obtained from other items of work. This, however, is characteristic of any overhead charge. Where the work is actually done, it, of course, goes into the entire figure, but usually any particular job forms such a small part of the whole that it has little effect upon the resultant figure. "Overhead" represents the cost of maintaining a certain necessary plant capacity, and this of course arises from the sum of all the work carried on over a period of time—whether it be a few months or a year is not particularly important. So, if it be conceded that recovery may be had for the reasonable cost of repairs, whether actually incurred or estimated, I am unable to see why overhead should not be included.

The fact that, as a bookkeeping proposition, the entire overhead was charged to and absorbed by the work actually performed, has nothing to do with the question whether it is a proper item in an estimated cost figure. Surely, even if the Navy Yard had been a commercial enterprise and had charged all of its overhead to work done for paying customers, included it in its price to them, and made a profit from them, it would not have affected the estimated cost of any particular proposed piece of work. In other words, in a commercial enterprise,

the fact that the owner is enabled to recoup a loss by increasing charges does not affect his right to recover damages for it. The same rule applies here.

The only remaining question is the certainty and dependability of the evidence by which the item is established. Calling it "indeterminate" keeps alive a sort of impression that it is the result of guesswork. As a matter of fact it was an estimate (as all overhead charges are) based upon evidence which in my judgment was sufficient to establish its substantial accuracy, which is all that is required.

In view of the peculiar facts of this case, I agree with the Commissioner that interest should be disallowed.

The libelant's first exception is sustained and the award increased by the amount of $5,483.

All other exceptions are dismissed.

Decree accordingly.