THE NYLAND.

THE E. KIRBY SMITH.

THE HOLLAND.

UNITED STATES of America, as owner of The E. Kirby Smith, and of her cargo

v.

THE HOLLAND, her engines, etc., and Baker-Whiteley Towing Co., Inc.

Matter of the Petition of The BAKER-WHITELEY TOWING CO., as owner of The Holland, for exoneration from or limitation of liability.

ANGFARTYGS A/B TIRFING, owner of The Swedish Motor Ship Nyland

v.

The UNITED STATES of America, Owner of The E. Kirby Smith; Baker-Whiteley Towing Co., Inc., and The Holland, official No. 270572, her engines, tackles, etc.

UNITED STATES of America, owner of The American Steamship E. Kirby Smith

v.

THE Swedish Motor Ship NYLAND, her boats, tackles, apparel, etc., and Angrartygasktiebolaget Tirfin. Nos. 3842, 3851, 3915, 3916.

United States District Court
D. Maryland.
Aug. 19, 1958.

Vandeventer, Black & Meredith, Norfolk, Va., and Ober, Williams, Grimes & Stinson, Baltimore, Md. (Hugh S. Meredith, Norfolk, Va., and Randall C. Coleman, Jr., Baltimore, Md., of counsel), for Angfartygs A/B Tirfing, owner of The Nyland.

Leon H. A. Pierson, U. S. Atty., Baltimore, Md. (Thomas F. McGovern, Thomas S. Schattenfield, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., of counsel), for United States, owner of The E. Kirby Smith.

Hagen & Eidenbach, New York City, and Skeen, Wilson & Coughlin, Baltimore, Md. (Henry C. Eidenbach, New York City, and John H. Skeen, Jr., Baltimore, Md., of counsel), for Baker-Whiteley Towing Co., owner of The Holland.

THOMSEN, Chief Judge.

This court has heretofore ruled in these suits that all three vessels—The E. Kirby Smith, The Nyland, and The Tug Holland—were at fault and should contribute equally to the damages resulting from the collision between The Smith and The Nyland on March 17, 1956. United States v. The Tug Holland, D.C., 151 F. Supp. 772. The case is now before the court to determine damages.

### A. The Government's Damages.

Certain items of expense to the government for watchmen, drydocking, wages of master and night mate, additional discharging expense, etc., totaling $26,910.54, are not disputed. There is a major dispute about three items of the government's claim.

#### 1. The damage to the ship herself.

 The Smith was a Liberty ship, which had been laid-up in the James River as part of the laid-up fleet for about ten years. She had, however, been specially fitted as a grain storage vessel at a cost of $26,000 to $36,000. She had greatly deteriorated over the years from the ordinary effect of the elements and had been damaged by Hurricane Hazel. It would have cost $273,500 to reactivate her as a "going" Liberty ship.[1] So restored, she would have had a value before the collision of $625,000. In reaching this figure, I have relied principally upon the sales of nine [2] Liberty ships during the first six months of 1956, which averaged about $624,000. "The worth of the thing is the price it will bring." The I. C. White, 4 Cir., 295 F. 593, 595, Rose, J., quoting Dr. Lushington, in The Clyde, Swaby 23. See also Texas Co. v. R. O'Brien & Co., 1 Cir., 242 F.2d 526. I have not given any weight to sales of ships in the latter half of 1956, because of the inflationary effect of the Suez incident. I have also considered the amounts at which similar ships were valued for insurance under valued policies and for other purposes by Allen and other representatives of the owner. Southern Shipyard Corp. v. The Tugboat Summitt, 4 Cir., 294 F. 284; Caten v. Salt City Movers & Storage Co., 2 Cir., 149 F.2d 428, 433, and cases cited; Benedict on Admiralty, 6 ed., by Knauth, sec. 381b; Wigmore on Evidence, 3 ed., vol. VI, sec. 1704. Subtracting the cost of restoration from the value of the ship so restored, the fair value of the Smith before the collision was $351,500.

The collision caused extensive damage to the Smith, which would have cost at least $269,121 to repair. The government, however, decided not to repair the ship, but to sell her for scrap. She brought $147,777.77. I find as a fact that it would have been uneconomical to repair the ship.

The Nyland and The Holland first suggest that the Smith had no value except her scrap value before the collision, that this value was not reduced by the collision, and that the government is entitled to nothing for the injury to the ship. There is no factual basis for this contention, and if there were the conclusion would be dubious. The London Corp. [1935] Probate 70; Shipowners & Merchants Tugboat Co. v. United States, 9 Cir., 205 F.2d 352; Boston Iron & Metal Co. v. S.S. Winding Gulf, D.C.D.Md., 85 F.Supp. 806; The L-1 (The Philadelphia), D.C.E.D.Pa., 10 F. Supp. 43. It is clear that the value of the ship was reduced by the collision.

The government contends that it is entitled to the reasonable cost of the repairs, $269,121, even though they were never made, it would have been uneconomical to make them, and the ship was promptly sold for scrap.

The principal contention of The Nyland and The Holland is that the allowance to the government should be limited to the diminution in market value due to the collision, i. e. her value before the collision less the amount realized from her sale. This would amount to $351,500 less $147,777.77, a difference of $203,722.23.

The controlling principles are set out in Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 45 S. Ct. 465, 69 L.Ed. 890; O'Brien Bros. v. The Helen B. Moran, 2 Cir., 160 F.2d 502; The I. C. White, supra. Where there has been a total loss, the measure of recovery is the value of the ship at the time of loss. If the loss is not total,

---

[1]. Cost of reactivation, $219,000; Strapping, $35,000; Rudder reinforcement, $11,500; Hatch coaming reinforcement, $8,000.

[2]. I have not included the alleged sale of the Pelagia, because it appears that she was not in fact sold.

the measure is ordinarily the reasonable expense of repairing the ship to an extent sufficient to put her in as good condition as she was before the collision, plus a reasonable allowance for loss of use. It is not necessary that the repairs be actually made. Theothilatos v. Martin Marine Transp. Co., 4 Cir., 127 F.2d 1016. But this rule is subject to two limitations: First, that the repairs must not exceed the fair value of the ship as she was before the injury; and second, that the cost of repairs must be less than the diminution in market value due to the injury, unless the ship has some special value to her owner greater than her value to others. The recovery should be limited to the actual loss suffered, and the injured party should not be allowed the expense of repair exceeding that limit. O'Brien Bros. v. The Helen B. Moran, supra. This is in accord with the rule generally applied where automobiles and other chattels are damaged. Restatement, Torts, sec. 928. Comment on Clause (a) of that Section states: "If it does not appear to a reasonable person economical to repair or replace the damaged part, the damages are the full value of the subject matter at the time of the tort, less the junk value of the remains." See also Gass v. Agate Ice Cream, Inc., 264 N.Y. 141, 190 N.E. 323.

The government's contention that it is entitled to recover the cost of repairs unless that cost exceeds the value of the ship before the collision, without deducting the scrap value thereafter, is not supported by either reason or authority. Hall v. Hayman [1912] 2 K.B. 5, relied on by the government, was a reinsurance case and involved the question whether the ship was a constructive total loss within the language of the Marine Insurance Act, 1906. It was held that that Act altered the common law, as it had been stated in Macbeth & Co. v. Maritime Ins. Co. [1908] A.C. at 147, 148. Hall v. Hayman does not throw any light on the damages which should be allowed in a collision case. The leading authorities on that question are cited above.

## 2. The undamaged wheat

The Smith was on her way to the port of Baltimore with a cargo of 228,000 bushels of wheat when the collision occurred. The wheat was to have been stowed in the B. & O. elevator at Baltimore until sold; there was no time limit on the use of this elevator. After the collision, the wheat was discharged from the Smith in the Norfolk area; 176,870.82 bushels of No. 1 Northern Spring Wheat and 28,026.00 bushels of No. 2 were salvaged in an undamaged condition and taken by Continental Grain Co. to its grain elevator for stowage.

Even under normal conditions, Norfolk does not provide as good a market as Baltimore for the sale of export wheat. Moreover, conditions in Norfolk during the period in question were abnormal. Because of a tugboat strike, Continental could not get ships to its pier to load grain from its elevator, and was building up a large backlog of grain.

Continental requested the government to move the grain promptly. Although the government was under no legal obligation to do so, it felt that there was some moral obligation; so it offered the wheat on a competitive bid basis on April 3, one week after the wheat had been placed in the elevator. No notice of the proposed sale was given to the representatives of either The Nyland or The Holland. Instead of offering the wheat in the usual manner, for thirty day lifting, the terms of the offer provided for ten day lifting. Only one bid was received, from Continental, in the amount of $1.67½ per bushel; it was rejected; the government re-offered the wheat on the following day. A bid was received from Continental in the amount of $1.73⅛ per bushel for the whole lot, and one from Leval and Company in the amount of $1.68¼ per bushel for the No. 1 grade only. The Continental bid was accepted, and Continental paid the government $354,727.61 for the grain. On April 4, the date of the sale to Continental, the government's offering price at Baltimore for No. 1 Northern Spring Wheat was $1.82⅜ per bushel, and for

No. 2, $1.80⅜. At those prices the government would have received $373,-120.06 for the 204,896.82 bushels of undamaged wheat. The government claims a loss of $18,392.45 from being forced to sell that wheat on the depressed Norfolk market.

■■ The Nyland and The Holland claim that the government failed to take proper steps to minimize its damage. They concede that the wheat had to be sold in Norfolk, because transportation charges for carrying the wheat from Norfolk to Baltimore would have increased the damages. But they urge that the government should have offered the wheat on the usual terms, and not for what was practically immediate loading. I find that the government was not obligated to sell the wheat in the manner in which the sale was made, and that the manner of sale affected the price which was received. An injured party has a duty to minimize its damages, and is barred from recovering damages which might have been avoided by reasonable effort.

Considering all of the evidence, I conclude that one-half of the claimed loss on this item should be allowed; i. e. $9,-196.23.

### 3. The damaged wheat

■ 23,103.18 bushels of No. 3 Northern Spring Wheat were damaged by salt water as a result of the collision. The government called for competitive bids and sold that wheat for 67¢ per bushel. It is not disputed that the No. 3 wheat could have been mixed with No. 2 wheat in the elevator to achieve a mixture all of which could have been sold as No. 2. The domestic price for a bushel of No. 3 in Baltimore during the period in question was $2.7864. The government was offering No. 2 for export out of Baltimore at $1.80⅜ per bushel.

The government claims $64,774.70, the difference between the domestic price of No. 3 and the sale price of the damaged wheat. The Nyland and The Holland contend that the allowance should be $21,892.84, the difference between the free world market price (export price) for No. 2 and the sale price.

The Commodity Credit Corporation was handling the grain pursuant to the powers granted it under the Commodity Credit Corporation Charter Act, 15 U.S.C.A. § 714 et seq. See also the Agricultural Adjustment Act of 1938, 7 U.S.C.A. § 1282. The government is so deeply involved in the grain business in this country that it practically controls the domestic market price. The government did not go out in the open market and purchase wheat to replace the wheat which was damaged in the collision. Inasmuch as that wheat was destined for export, it presumably was replaced by other surplus wheat which was being stored by the government.

In practice the wheat which the government buys from farmers is either sold for export or donated to foreign countries. If the government had not had a huge reserve, and had still wanted to donate or sell to a foreign country, it could have entered the world market and purchased replacement wheat at the export price. Furthermore, if there had been no collision, the government would have received only the export price for this wheat.

The government is entitled to "compensation for the injury suffered". Illinois Central R. Co. v. Crail, 281 U.S. 57, 63, 50 S.Ct. 180, 181, 74 L.Ed. 699. Under the facts, the government's claim on account of the damaged wheat should be limited to the difference between the free world market price (export price) and the sale price; i. e. $21,892.84.

The government should be allowed the following amounts:

| | |
|---|---|
| Undisputed items | $ 26,910.54 |
| Damage to the ship | 203,722.23 |
| Undamaged wheat | 9,196.23 |
| Damaged wheat | 21,892.84 |
| | |
| Total | $261,721.84 |

### B. The Nyland's Damage

■ Certain items of damage sustained by the Nyland totaling $82,765.29

are not disputed. In addition, her owners are entitled to recover $2,390.60 for painting her bottom while she was in drydock. Navigazione Libera Triestina Societa Anonima v. Newtown Creek Towing Co. (The Isonzo II), 2 Cir., 98 F.2d 694, 698; The Cape Friendship, D.C.D. Md., 100 F.Supp. 856, 861. They are also entitled to recover $4,436.87 for wages, taxes and food for the crew during the detention period, March 17 to April 1. This item is not duplicated in any other item. See Moore-McCormack Lines, Inc., v. The Esso Camden, 2 Cir., 244 F.2d 198.

The principal questions are: (1) how much, if anything, the Nyland is entitled to recover for loss of profits, and (2) whether the Nyland is entitled to recover payments made for overtime which reduced the period during which she was detained.

### 1. Loss of profit

█ The Nyland was detained at the port of Hampton Roads from March 17 to April 1, a period of 15 days.[3]

The Nyland offered evidence tending to prove her net earnings for the year 1955, for the year 1956, for the voyage during which the collision occurred, for the previous voyage, and for the subsequent voyage. These proofs are not completely satisfactory, but are sufficient to support the findings set out below.

None of the parties contends that the loss of profits should be based on the annual earnings. The government and The Holland contend that the loss should be computed on the basis of three voyages, the pre-collision voyage, the collision voyage and the post-collision voyage.

The Nyland contends that the loss of profits should be based on the single voyage during which the collision occurred, and that the profits for that voyage should be increased by the freight which she would have earned if she had carried 165 automobiles from Elizabeth City, N. C., to Rio de Janeiro, Brazil, less the additional expense of loading and unloading such automobiles. The evidence, however, is not legally sufficient to prove that the Nyland would have carried any automobiles if she had not been in the collision, because there was no firm commitment for such carriage nor any reasonable expectation that there would be a firm commitment. Automobiles were being shipped by various dealers in the United States to Brazil in March, 1956, in anticipation of an import tax of more that $1,000 per car which went into effect on April 2. The dealers and the forwarders were negotiating with various ships, and the forwarders were unwilling to make any firm commitment unless the dealers advanced the proposed tax, which they were unwilling to do.

█ Demurrage is recoverable only when profits have actually been, or may reasonably be supposed to have been lost, and such profits can be proven with reasonable certainty. The Conqueror, 166 U.S. 110, 125, 17 S.Ct. 510, 41 L.Ed. 937. The measure of a ship's demurrage is the amount the vessel would have earned in the business in which she has been customarily employed. Williamson v. Barrett, 13 How. 101, 110, 54 U.S. 101, 110, 14 L.Ed. 68. On consideration of all the circumstances in this case the fairest measure of lost profits is the average daily earnings over the period of the three voyages, the pre-collision voyage, the collision voyage and the post-collision voyage. Moore-McCormack Lines, Inc., v. The Esso Camden, 2 Cir., 244 F.2d 198. Cf. The Gylfe v. The Trujillo, 2 Cir., 209 F.2d 386. See also The Tremont, 9 Cir., 161 F. 1.

On the voyage during which the collision occurred, The Nyland earned at the rate of 2,986 kroner per day, equal to $574 per day, after making allowance for the 15 day period during which she was actually laid up as a result of the collision.

During the preceding voyage, she earned at the rate of 2,272 kroner, or $437, per day.

---

3. Actually 14 days, 22 hours and 45 minutes.

During the voyage next following the collision, she earned at the rate of 3,099 kroner, $596, per day.

Applying the three-voyage rule, the loss of profits from the detention of The Nyland at Newport News should be compensated for at the rate of $536 per day. Since The Nyland was detained for approximately 15 days, this loss amounts to $8,040.

### 2. Overtime

<span></span> Repairs were started on the morning of March 19 and were completed on the morning of April 1, a period of 13 days. The original estimate was that the repairs would take 18 working days, which would have held the ship until at least April 11, allowing for Saturdays and Sundays. The overtime work, which cost $11,709, saved The Nyland 10 days detention time, including Saturdays and Sundays. Her owners are therefore entitled to an allowance of this amount, provided it minimized the damages. Since they did not get the approval of the representatives of the other ships to do the overtime work, they cannot recover on account of this item any more than the damages would have been increased if the overtime work had not been done.

The loss of profits amounted to $536 per day of detention. The cost of wages and food for the crew amounted to about $296 per day. There would probably have been other expenses, but they have not been proved. Since ten days were saved, an allowance of $8,320 for overtime is proper.

The owners of The Nyland should be allowed the following amounts:

| | |
|---|---|
| Undisputed items | $ 82,765.29 |
| Painting | 2,390.60 |
| Wages, etc. during detention | 4,436.87 |
| Loss of profits | 8,040.00 |
| Overtime | 8,320.00 |
| | $105,952.76 |

### C. Allocation of Damages

Under the prior decree each vessel must bear one-third of the damages. The total damages are $367,674.60, $261,721.84 to the government, $105,952.76 to the owners of The Nyland. Each vessel must bear $122,558.20. The Holland should pay $122,558.20 to the government and The Nyland $16,605.44, with interest at 3% per annum from April 1, 1956, to the date of this opinion, August 19, 1958, and at 6% thereafter.