HURON BARGE CO. v. TURNEY et al.

(District Court, N. D. Ohio, E. D. March 3, 1897.)

DEMURRAGE—DETENTION IN LOADING, ETC.—MEASURE OF DAMAGES.

The measure of damages for detention of a vessel, in loading or unloading, beyond the time stipulated in her charter, is the probable net earnings of such vessel during the period of her detention, and an inquiry into a subsequent period is inadmissible.

Hoyt, Dustin & Kelley, for libelant.

Squire, Sanders & Dempsey, for respondents.

SAGE, District Judge. This case is before the court upon exceptions to the commissioner's report. Exceptions are filed by libelant, and also by respondents.

The case was brought by the Huron Barge Company, as owner of the steamer Pathfinder and her consort, the Sagamore, a tow barge, against Turney and Jones, upon a contract of charter party, made in the fall of 1893, whereby said two vessels were to transport cargoes of coal for respondents from Cleveland, Ohio, to Manitowoc, Mich. Respondents were to furnish separate docks for the vessels, and load them at Cleveland in three days, and furnish them with separate docks at Manitowoc, and unload them in two days.

Upon the hearing before Judge Ricks, he found the charter to be as stated above, and that its terms were not complied with by respondents. A decree was entered against respondents, and the case referred to the commissioner to ascertain the amount of the damage.

The only questions left by the court to be determined by the commissioner were: First, how long the vessels were delayed at Cleveland and Manitowoc beyond the time fixed by the charter; and, second, the value of the time of the vessels, so lost, which is the proper measure of the damage suffered by the libelant by reason of the breach of the charter party.

The entire evidence adduced at the hearing was, by stipulation, to be treated as evidence before the commissioner. The respondents offered no additional evidence before the commissioner.

The case is now before the court upon the testimony taken before the commissioner on behalf of the libelant, and so much of the testimony which was before the court at the hearing as is relevant to the question of delay and the conditions of navigation during that time. The commissioner finds that the vessels were delayed at Cleveland and Manitowoc seven days beyond the time when they should have been loaded under the charter. But for that delay, the vessels would have been unloaded at Manitowoc, and free for other uses, on the afternoon of November 28, 1893. By reason of the delay, they did not get away from Manitowoc until December 5th,—seven days later.

The commissioner finds that the claim for delay is just, and that, had the vessels been loaded and unloaded as agreed, the libelants could have received cargo at Chicago, and delivered it at Buffalo before the expiration of their insurance; that the libelants claimed that it was their intention to take the cargo from Chicago to Buffalo, and discharge it, and then bring their vessels to Cleveland, and lay them up, unless they should receive a good rate for the winter storage of grain at Buffalo.

He further finds that, had the delay not occurred, and had the vessels arrived in Chicago on the 29th of November, they could hardly have made the trip to Buffalo, discharged their cargoes, and returned to Cleveland before the expiration of their insurance, as it would have taken six days to load the vessels at Chicago and make the run

to Buffalo, which would have brought them there on the morning of the 5th of December, not quite allowing them time to unload at Buffalo and return to Cleveland under insurance; that, therefore, they would have had to lay up at Buffalo, or take a cargo for winter storage. As it was, they were obliged to lay their boats up in Chicago, and store them with grain for delivery at Buffalo in the spring. He further finds that, while they did not make the trip from Chicago to Buffalo in the fall, they received winter storage in Chicago, where they laid up, and went to Buffalo in the spring; and, further, that the libelant suffered by this change, and delays in Buffalo in the spring, which they would not have suffered had they made the trip in the fall. For these reasons, he finds that the libelant is entitled to recover for the delay in the loading and unloading, and for the detention at Buffalo, but not for the full charter value of the vessel, as claimed for the libelant. He proceeded to make a finding that the fixed charges or expenses of the two vessels were $136.32 per day during their detention, and that they were entitled, for seven days' detention in loading at Cleveland, to these fixed charges or expenses, amounting, for seven days, to $954.24, and for nine days' detention at Buffalo, in the spring of 1894, at the same rate of $136.32 per day, $1,226.88; making a total of $2,181.12,—assuming that the fixed charges per day at Buffalo would be the same as they were at Cleveland and Manitowoc. He also allowed interest on $3,477.96, the net freight of the cargoes, from December 6, 1893, to April 10, 1894, being the estimated time the freight was earned in the spring, allowing five days from Chicago to Buffalo; the testimony showing that the boats left Chicago on the morning of April 5, 1894.

The objection to these findings is that they are based upon a departure from the established rule of damages. That rule is, as was laid down in Williamson v. Barrett, 13 How. 101, that the amount of the loss is the market value of the use of the vessel, or her probable net earnings during the period of her detention. The supreme court, in passing upon that case, said:

"If there is no demand for the employment, and, of course, no hire to be obtained, no compensation for the detention during the repairs will be allowed, as no loss would be sustained; but, if it can be shown that the vessel might have been chartered during the period of repairs, it is impossible to deny that the owner has lost, in consequence of the damage, the amount which he might have thus earned. The market price, therefore, of the hire of the vessel, applied as a test of the value of the service, will be, if not as certain as in the case where she has a charter party, at least so certain that, for all practical purposes in the administration of justice, no substantial distinction can be made. It can be ascertained as readily, and with as much precision, as the price of any general commodity in the market, and affords as clear a rule for estimating the damages sustained on account of the loss of her services as exists in the case of damage to any other description of personal property of which the party has been deprived."

In the case of The Cayuga, 2 Ben. 125, Fed. Cas. No. 2,535, the libelant's craft was a ferryboat; and the court held that:

"There being no market price, a judgment as to her value, given by men having experience upon the ferries, founded upon their knowledge of the business, is the natural way to ascertain the loss."

This case was affirmed by the circuit court (see Fed. Cas. No. 2,-537), and by the supreme court in 14 Wall. 270.

Spencer, at section 204 of his work on Marine Collisions, states the rule as follows:

"A convenient method of determining such loss, and one often resorted to by the courts, is by ascertaining what the vessel was earning at the time of or immediately before the collision; and by ascertaining what, if any, provisions have been made for the continuance of such earnings. Where there is no other evidence of the earning capacity of the ship than is shown by the charter or contract under which it is employed at the time of the collision, the average daily earnings under it may be taken as a standard of measurement. It is not necessary, to entitle a recovery for damages, to show that the injured vessel was actually under charter during the time of the detention. If it is clearly shown what the market value of the use of vessels of the class in question was or is during the time, recovery may be had for such sum, where it is shown with a reasonable degree of certainty that the vessel would have been actually employed, but for the detention."

In The Margaret J. Sanford, 37 Fed. 148,—a circuit court case, decided by Wallace, J.,—it appears from the syllabus that:

"The T. was a 'tramp' steamer, occasionally visiting the port of New York, and was under a charter for a voyage to Bombay, on which she would have earned, above expenses, $70 per day. The charter stipulated for demurrage at the rate of £45 per day, while it appeared that the customary allowance at the port of New York for the detention of vessels the size of the T. was $262 per day. The vessel had no engagement beyond the immediate voyage, and it was shown that after her arrival at destination she found immediate employment. Held, that neither the demurrage rate specified in the charter nor the customary demurrage rates at the port of New York supplied a satisfactory criterion of the loss sustained by the vessel's detention during repairs; that the amount of consequential loss was the market value for the use of the vessel, or her probable net earnings, during the period of detention; and one way of ascertaining this was by finding what she was earning at the time, or immediately before and after the collision; and that if, at the time, she was employed under a charter for a long period of time, the average daily earnings under the charter may be taken as a criterion."

Spencer, in his treatise on Marine Collisions, speaking of loss of anticipated profits in cases of collision, says, in section 203:

"There must, of necessity, be some limit beyond which recovery for prospective profits cannot be permitted, beyond which inquiry as to probable results would partake too much of the fanciful or speculative to afford a safe guide to conclusions. In the absence of a better limitation of inquiry, the courts have limited recovery to the voyage entered upon when collision occurs, and only then upon proof so clear that it is divested of all substantial doubts that, had the collision not occurred, profits for the voyage would have resulted to the ship."

This rule is in harmony with the rules stated in the authorities above, and the circumstances of this case, as developed before the commissioner and made the basis of his report, illustrate the wisdom of the rule, and the difficulties which result from a departure from it.

The commissioner found it necessary to consider the probability of detention of the vessels at Buffalo in the spring of 1894. In other words, he was at once forced to give attention to uncertain and speculative conditions which laid him open to the criticism that if his investigation was at all proper he should have extended it so as to have included a loss of one-half cent per bushel on 242,400 bushels of grain on the rate of winter storage at Chicago compared with the rate of winter storage at Buffalo,—that loss amounting to $1,212; also extra expense of laying up at dock, transportation of crews to and from Chicago, tug bills from Chicago to South Chicago, estimated at $1,000, which should be added to the commissioner's allowance.

My conclusion is that the libelant's exceptions to the commissioner's report are well taken: that the rule of damages is the probable net earnings of the vessels during the period of their detention, and that inquiry into a period subsequent is inadmissible.

Respondents' exceptions call into question rulings made by the judge who presided at the hearing. Those rulings will not be reviewed upon these exceptions. This court is not now sitting in error upon the decision made by the learned judge who ordered the decree under which the commissioner acted. The respondents' exceptions are therefore overruled.

The case will be remanded to the commissioner, with instructions to prepare a report in accordance with this opinion.