## W. S. KEYSER & CO. v. JURVELIUS.

(Circuit Court of Appeals, Fifth Circuit. March 31, 1903.)

### No. 1,220.

1. SHIPPING—CHARTER PARTY—DELAY FROM CHARTERER'S NAMING UNSAFE PORT OF DELIVERY.

A firm of shipping agents chartered a vessel "as agents for charterers," but without disclosing any principal, to carry a cargo of lumber from Pensacola to "any safe port" in the western Mediterranean. Before time for entering on the voyage, they chartered to respondents at an increased rate of freight. *Held*, that respondents were not bound as principals under the original charter, but were shippers charged with notice of such charter, and, while not held to the stipulations therein as to demurrage days and rate of demurrage, they were bound, within a reasonable time after loading, to name a safe Mediterranean port for delivery of cargo, and liable for the detention of the vessel necessarily resulting from their naming an unsafe port, for which the master refused to sign bills of lading.

2. SAME—MEASURE OF DAMAGES FOR DETENTION.

Where a vessel, after she was loaded and ready to sail, with full crew on board, was detained through the fault of the subcharterer, who was not bound by the stipulations of the original charter as to rate of demurrage, and there is no evidence as to her future employment or ability to obtain it, but her gross yearly earnings are shown, such earnings will be considered, together with the demurrage stipulated for in her charter, in fixing the amount of damages recoverable for the delay.

3. ADMIRALTY—PLEADING.

In admiralty the parties are not held to great nicety in pleading, and where a libel states facts which warrant a recovery, and the real issues are tried, a recovery will not be denied because the libel counts on the breach of a charter which is not binding on respondent.

Appeal from the District Court of the United States for the Northern District of Florida.

John C. Avery, for appellant.

Ben C. Tunison and Scott M. Loftin, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge. In Genoa, Italy, on the 18th of November, 1898, a charter party was entered into between Victor Jurvelius, master and agent of the Russian ship Amelie, of the burden of 495 tons register or thereabouts, then lying at Marseilles, bound for a voyage to Rio Janeiro with cargo, and Messrs. Rosasco Bros., of Pensacola, Fla., styling themselves "agents for charterers," but with no principal disclosed, providing that the said ship, as soon as discharged at Rio Janeiro, should proceed to Pensacola, Fla., and there load from factors of said merchants or agents a cargo of lumber, and thence proceed to any safe port in the Mediterranean not east

¶ 2. Demurrage, see notes to Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.

of Sicily (Spanish ports excluded), as ordered, on signing bills of lading and delivering the same (always afloat), on being paid freight agreed upon; the charterers to have the privilege of ordering the vessel to Barcelona and other Spanish-Mediterranean ports at certain increased rates of freight. On the 28th of January, 1899—2 months and 10 days after the first charter—A. T. Rosasco, styling himself "agent of the good ship called the Amelie, of burden," etc., entered into a charter party with W. S. Keyser & Co., of Pensacola, through Crow, Rudolph & Co., as agents, agreeing upon a voyage of the Amelie from Pensacola, Fla., to any Spanish port in the Mediterranean (Barcelona excluded); and otherwise in all respects on the same terms and conditions as the first charter party, except in respect to freight charges, which were increased some seven shillings and six pence, on the St. Petersburg standard of 165 cubic feet. Both charter parties contained the cessor clause in favor of charterers, and both stipulated 5 per cent. commission due by the vessel to Rosasco Bros., of Pensacola, Fla., the vessel lost or not lost, charter canceled or uncanceled, and to report at port of loading with the Rosasco Bros., paying five cents per registered ton, to be signed to them or their agents at port of discharge for ship's inward or outward business, ship paying customary charges. In due course the Amelie arrived at Pensacola May 24, 1899, and on that day the master notified Rosasco Bros. of such arrival, and named the days for loading to commence on Monday, May 29th, under the charter party dated 18th of November, 1898; at the same time notified said Rosasco Bros. that he was informed it was the intention of the charterers to load cargo under this charter party for Castellon, Spain; that this place is not a safe port, within the meaning of the charter party, and that he thereby refused to accept cargo or sign bills of lading for such destination. On May 25, 1899, Rosasco Bros. notified the master, in writing, as follows: "We beg to inform you that the charterers of the bark Amelie are Messrs. W. S. Keyser & Co., who will load vessel as per charter party made through us as agents for charterers." In regard to this last-mentioned notice there seems to be a decided misunderstanding on the part of the master of the ship Amelie, who, in his pleadings, says he was not notified that there had been any subcharter entered into, and that he regarded and treated the said Rosasco Bros. as the charterers of the said vessel, and had no knowledge whatever that any other charter party was in existence. However this may be, Keyser & Co. began to furnish cargo and to load the vessel, and proceeded therewith until the 16th day of June, when cargo was complete; and thereupon, on June 19th, Keyser & Co. presented to the master for signature a bill of lading consigning the said vessel to Castellon, Spain. The master of the Amelie refused to sign this bill of lading on the ground that Castellon, Spain, was not a safe port within the terms of his charter party. No other satisfactory port being named, and no bill of lading signed, on the 23d day of June following, William Keyser & Co. exhibited a libel against the Amelie and her cargo, setting forth the foregoing, charging that the action of the master constituted a conversion of the cargo entitling Keyser & Co. to hold the

bark responsible for the value of the cargo and for damages, and thereupon the Amelie and cargo were taken into the custody of the marshal. Thereafter, on the 5th day of July, on the petition of Victor Jurvelius, master, the court entered an order allowing the said Jurvelius to make his claim to the said bark Amelie and cargo, and answer and defend the action, upon entering into a personal stipulation, without sureties, for $250, and without other security to file a cross-bill against the cargo; and thereupon said Jurvelius exhibited a claim and intervention and cross-bill, which appear to have been sworn to on the 8th day of July, no date of filing given.

At this stage of the case the parties entered into further negotiations, resulting in an agreement as follows:

"Pensacola, 12th July, 1899.

"It is hereby agreed between Victor Jurvelius, master and owner of the Russian bark Amelie, and W. S. Keyser & Co., owners and shippers of the cargo now laden on the said bark, as follows:

"1. The master will sign bills of lading providing for delivery of cargo now on board at port of Valencia, Spain, same as presented by Mr. Rosasco.

"2. All actions pending at Pensacola stand dismissed.

"3. The cessor clause of the charter party is waived.

"4. No claim or lien on the cargo for demurrage or detention shall be insisted upon.

"5. The master of said bark may bring an action in personam at Pensacola for the recovery of any damages he may in such action be able to establish for demurrage or detention; none being admitted.

"6. The making of this agreement is not to be taken as an admission that W. S. Keyser & Co. had no right to order said bark to Castellon with said cargo, or that the suit they brought against said bark and cargo was improperly brought; neither shall the making of this agreement be an admission by the master and owner that Castellon was a safe port, within the meaning of the charter part.

"7. The true intent of the parties hereto is that, in any suit brought the parties are free to insist upon any contention that they might have insisted upon had this agreement not been made, not herein expressly waived.

"8. It is further understood and agreed that the entering into this agreement is to be taken and accepted as a final and complete settlement of all differences existing between the parties hereto, except the claim of master of ship for demurrage and detention above referred to, but no differences are waived or settled to the extent of depriving either party of the right to insist upon them in the prosecution or resistance of such claim.

"[Signed]                                Victor Jurvelius.

"[Signed]                            .         W. S. Keyser & Co."

Under this agreement a bill of lading was executed pending suits dismissed, and thereupon Victor Jurvelius, the master of the Amelie, exhibited his present libel against Keyser & Co., setting out the original charter party, charging that Keyser & Co. were the original charterers, averring that Keyser & Co. did not deliver cargo within the 12 days mentioned in the charter party, but so delayed delivering cargo that they became responsible under the terms of the charter party for 6 days' demurrage at the rate of four pence sterling per net registered ton, and also averring that through their failure to name a safe port as to destination of the cargo within the terms of the charter party the said Amelie was detained from the 17th day of June to the 12th day of July, a period of 25 days, to the damage of the ship $1,500, for which demurrage and detention he claims judgment.

Under these facts, in the light of other evidence in the case, we think it clear that Keyser & Co. cannot be held as the original charterers of the Amelie, nor strictly as assignees of the original charter party, but they should be held as freighters or shippers, charged with notice of charter party. The original charterers were Rosasco Bros. for their own account, not perhaps intending to load the vessel, but to dispose of their charter for profit. If Keyser & Co. had been the original charterers, there was no necessity at all for the second charter party, and, if it nevertheless had been made, it would not have provided for an increase of freight, nor have excluded Keyser & Co. from the port of Barcelona. The exclusion from the port of Barcelona was necessary to Rosasco Bros. in order to secure their profit under the charter. Nor do we think that in the matter of loading the ship in the port of Pensacola Keyser & Co. became bound by the terms of the original charter party any further than as resulted from their real position—that of shippers of cargo with notice of charter party.

It follows from this that the stipulations of the original charter party as to specified demurrage and amount of demurrage did not conclude Keyser & Co. as to their liability for detention. As shippers of cargo, however, with a supposed knowledge of the original charter party, they were bound, within a reasonable time after cargo was aboard, to name a safe port in the Mediterranean for the delivery of the cargo; and, if they failed in this, they were responsible for the detention of the ship necessarily resulting. See Maclachlan, p. 371. They named as the port of delivery Castellon, Spain, which the master claimed was not a safe port, and thereupon refused to sign the bill of lading. The evidence exhibited in this case establishes that therein the master was within his right, as Castellon was not a safe port within the meaning of the charter party. It follows that for the detention of the ship from the 16th day of June to the 12th day of July Keyser & Co. were responsible.

It seems that on the 30th of June Keyser & Co. offered to accept bills of lading "to Castellon, or as near thereto as the vessel can get and discharge (always afloat)." This was met with the counter proposition to sign bills of lading "to Castellon, or as near thereto as ship can safely get and safely lie and discharge." These propositions were under discussion several days, until on the 6th of July the master notified Keyser & Co. that he would not sign bills of lading at all for Castellon. It may be that, if Keyser & Co. had stood upon the proposition to accept bills of lading "to Castellon, or as near thereto as vessel can safely get and discharge (always afloat)," we might, under the evidence in this case, find that thereby they had named a safe port within the meaning of the charter party; but the proposition seems not to have been insisted upon, and, the matter having ended in a compromise settlement on the 12th day of July fixing Valencia as the port of discharge, we feel compelled to take this latter date as the end of detention in finding the number of days the Amelie was detained through the fault of shippers of cargo.

Damages for this delay—25 days—should be adjudged against Keyser & Co. The rule of damages in the case of improper deten-

tion of a vessel is not fixed and certain, but the damages to be allowed are dependent upon the circumstances. If the vessel is not employed, and no hire to be obtained, no damages are sustained. If the vessel is under contract, or can obtain employment, the net earnings may furnish the rule. Where, however, the vessel is detained with full cargo and crew on board, all expenses going on, the earnings of the vessel furnish decided assistance in determining the damages. For a discussion of this subject under a charter party, see Barge Co. v. Turney (D. C.) 79 Fed. 109. In cases of collision, see Williamson v. Barrett, 13 How. 101, 111, 14 L. Ed. 68; The Cayuga, 14 Wall. 270, 278, 20 L. Ed. 828. In this case we have the Amelie apparently ready to sail, with full cargo, but no evidence as to her future employment or ability to obtain the same. The libelants claim a rate as fixed in the charter party for demurrage as damages for the detention, but, as we have said above, we do not consider that Keyser & Co. were bound by the stipulations of the original charter party as to demurrage days, nor do we consider that they were bound by the rate of demurrage specified in said charter party; i. e., four pence sterling per day per net registered ton. It sometimes occurs that where the freighters are not bound by the stipulated rate of demurrage as fixed in the charter party, and yet are liable for detention, and there is no other evidence in the case bearing upon the question of damages resulting from detention, we are compelled to assess damages on the basis of the rate stipulated; but in this case there is evidence of the gross yearly earnings of the Amelie and of her net yearly earnings, and, as Keyser & Co. are not bound by the very high stipulated rate of demurrage, we are of opinion that in assessing damages in this case we ought to consider, in connection with the stipulated rate, the gross yearly earnings of the Amelie. These gross yearly earnings are shown by the master to be £1,261 17s. 4d., or, at $4.80 to the £1, $6,058.92, or $16.89 per day. Considering this with the rate stipulated in the charter party and the surroundings shown by the evidence, we are satisfied that $30 per day damages for the detention will be reasonably fair and just between the parties, and this, for 25 days, amounts to $750.

There is some contention on the part of Keyser & Co. that no recovery can be had against them in this action, because this suit is brought for a breach of the charter party, to which they were not parties; and the appellees claim that the assignments of error are not sufficiently specific, under our rules, to allow consideration of the material questions in the case. In admiralty we do not always hold to a great nicety in pleadings, and as in this case the libel, although charging Keyser & Co. as charterers, sets out the facts in the case, and the answer and evidence meet the real issues, and the assignments of error point out the questions for this court, the above contentions are not well founded.

There are some other matters discussed in the briefs, but we think they need no specific ruling.

The decree of the District Court is amended by reducing the amount allowed the libelant below to $750, and, as thus amended, the decree of the District Court is affirmed. Appellant to recover the costs in this court and to pay the costs in the District Court.